UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

GARTNER, INC.,

                              Plaintiff,            20-cv-4885 (JGK)

              - against -                           OPINION AND ORDER

HCC SPECIALTY UNDERWRITERS, INC. and
U.S. SPECIALTY INSURANCE COMPANY,

                              Defendants.
_____

JOHN G. KOELTL, District Judge:

    Gartner, Inc. ("Gartner") brought this motion for
declaratory relief, breach of contract, breach of the covenant
of good faith and fair dealing, unfair claims settlement
practices, unfair trade practices, and equitable estoppel
arising out of the defendants' alleged failure to fulfill their
obligations under "event cancellation" policies that were
negotiated and underwritten by HCC Specialty Underwriters, Inc.
("HCC") as agent for its affiliate, U.S. Specialty Insurance
Company ("USSIC"), the insurer.

    The plaintiff now moves to disqualify the defendants'
counsel, Norton Rose Fulbright US LLP ("NRFUS"). The plaintiff
argues that a conflict of interest between it and NRFUS exists
on the ground that Norton Rose Fulbright Australia ("NRFA"), a
member of the Norton Rose Fulbright verein ("NRF"), was
concurrently representing Gartner Australasia, a subsidiary of
Gartner, at the time that this dispute arose. For the following
reasons, the plaintiff's motion to disqualify NRFUS is **denied**.

1

I.

The following facts are taken from the evidence introduced at the November 8, 2021, evidentiary hearing, as well as the evidence submitted in connection with the plaintiff's motion.

The plaintiff, Gartner, is a global research and advisory firm headquartered in the United States. Tr. 7, ECF No. 80.[1] Gartner has a "complicated corporate structure," with several subsidiaries — including Gartner Australasia. Id. at 8, 47. The subsidiaries' principal activities include "the sale and support of research and analysis produced by Gartner, Inc. and advisory services and related events delivered by the company." See id. at 74. Each of the subsidiaries has its own corporate structure and board of directors, see id. at 11, 47, and, being formally independent from Gartner, enters contracts in its own name, and has its own "tax ID number, bank accounts, payroll system, capital, assets, employees, and offices," id. 48–49. Gartner subsidiaries may also take legal action in their own names, id. at 49–50, and some subsidiaries, like Gartner Australasia, have their own in-house attorneys, as well as their own general counsel, id. at 53–55.

---

[1] Unless otherwise noted, all citations to the transcript refer to the transcript taken at the November 8, 2021 evidentiary hearing. Also, unless otherwise noted, this Opinion and Order omits all alterations, citations, footnotes, and internal quotation marks in quoted text.

But even though Gartner is formally separate from its subsidiaries, many of their operations are centralized. See, e.g., id. at 11-13. For example, Gartner's finance department is centrally managed and serves its subsidiaries. See id. at 12. Gartner's information technology ("IT") systems are also "mostly" integrated with those of its subsidiaries, and Gartner has numerous shared policies with its subsidiaries, including a code of conduct, non-discrimination and non-harassment policies, and a travel policy. Id. Gartner and its subsidiaries also maintain a single e-mail system, audit program, data privacy function, compliance function, and insurance program. Id. at 12-13, 80. Gartner's conferences business — one of its largest functions — is also integrated, with Gartner employees and Gartner subsidiary employees working together to run, operate, and produce conferences. See id. at 72.

Notably, Gartner's legal department and that of its subsidiaries are also designed to operate centrally "as one" through Jules Kaufman, Gartner's General Counsel. See id. at 11-14. Mr. Kaufman has several direct reports at Gartner, including a global data privacy officer, a global compliance officer, and a global employment lawyer. Id. at 12-14. These direct reports are Gartner employees, but they each supervise and manage Gartner subsidiary lawyers worldwide in their relevant area of expertise. See id.; see, e.g., id. at 10. Thus, Gartner's global

employment lawyer, Robin Frederick, supervises Gartner
Australasia's General Counsel, Anne Tracy, on employment
matters, see id. at 8, 16, 55, joining in phone calls,
participating in email communications, and requesting that
certain work be performed, id. at 58; see, e.g., id. at 27.

In March 2020, when the COVID-19 virus brought the world
"to a screeching halt," Gartner was forced to cancel its
destination conferences. Id. at 26. As a result, Gartner
Australasia was forced to furlough or sever many of its
employees, ultimately requiring the expertise of outside
counsel. Id. at 27. Ms. Tracy retained NRFA, with whom she had
worked for many years, to assist her and Ms. Frederick. Id. at
24, 26-27. Around this time, Gartner also began corresponding
with its insurers about coverage for event cancellations. Id. at
85. Gartner initially sought coverage for $280 million in losses
resulting directly from canceled conferences in Australasia and
elsewhere, but Gartner has recently indicated that it intends to
seek additional coverage for related furloughs and layoffs. Id.
at 75, 83-84.

On May 27, 2020, USSIC, represented by NRFUS, filed two
lawsuits against Gartner in the Southern District of Texas
(collectively, the "Texas actions") seeking a declaration that
it was not required to pay Gartner for the COVID-19-related
cancellations. Id. at 29; see also U.S. Specialty Insurance Co.

v. Gartner, Inc., No. 4:20-cv-01850 (S.D. Tex. filed May 27,
2020); U.S. Specialty Insurance Co. v. Gartner, Inc., No. 4:20-
cv-01851 (S.D. Tex. filed May 27, 2020). No one at NRFA, NRFUS,
or NRF generally, contacted Gartner or Gartner Australasia about
this representation in advance of the filing of these lawsuits,
even though NRFA continued to represent Gartner Australasia at
this time. Tr. 29-30. Indeed, in May and early June 2020, NRFA
representatives were corresponding with Gartner Australasia's
attorneys about the terms of their ongoing outside counsel
relationship. See, e.g., ECF No. 42-6.

Members of the legal teams at Gartner and Gartner
Australasia were allegedly "shock[ed]" and "surpris[ed]" that
"[their] lawyers" were appearing against them. Tr. 30. Ms. Tracy
and her direct contact at NRFA began corresponding about the
alleged conflict almost immediately. See id. at 32; ECF No. 42-
15. On June 4, a partner with NRFA informed Ms. Tracy that the
firm's position was that no conflict existed, but "assure[d]
[her] that measures [were then] in place to ensure that those
providing assistance to the insurance company cannot access
information provided to [NRFA] during the course of other
matters." ECF No. 42-16, at 1. At some point during June 2020,
Gartner Australasia stopped giving new assignments to NRFA, Tr.
62, although the relationship between the two did not formally
end, see ECF No. 42-19, at 2. On June 23, 2020, Ms. Frederick

formally requested that NRFUS withdraw from its representation
of USSIC against Gartner because "Gartner [was] a current client
of NRF." Tr. 34; ECF No. 42-17, at 2. Two days later, on June
25, 2020, Gartner filed this action. ECF No. 1. On the same day,
Gartner moved to dismiss the Texas actions for lack of personal
jurisdiction; it also moved to dismiss both actions under the
Declaratory Judgment Act, or in the alternative, to transfer the
Texas actions to this Court. See Gartner, No. 4:20-cv-1850, ECF
Nos. 11, 12; Gartner, No. 4:20-cv-1851, ECF Nos. 11, 12.

On July 28, 2020, Gartner's outside counsel in the Texas
actions, Julie Hardin, called her opposing counsel at NRFUS,
"rais[ing] the possibility that Gartner might agree to a
conflict waiver if USSIC agreed to transfer the cases to New
York, where Gartner believes personal jurisdiction is proper."
ECF No. 46-1 ¶¶ 4, 6. On August 7, Ms. Hardin notified NRFUS
that Gartner might soon file a motion to disqualify them. ECF
No. 42-11. On August 14, NRFA again assured Gartner that it
"ha[d] established information barriers with the consequence
that Gartner Australasia's confidential information will not be
disclosed to NRFUS," while admitting that Gartner Australasia
was a "current client of NRFA" at the time of writing. ECF No.
42-19. NRFUS has since disclosed that some NRFA lawyers had done
some research "related to this case," Tr. 95, but represents
that none of the NRFA lawyers who performed this work ever

6

worked on Gartner Australasia's matters, id. at 96. The "bulk" of the lawyers who did that work are no longer employed by NRFA. Id. at 108. NRFUS has also attested that no "lawyers working for the Texas lawsuit have [or have had] access to any of Gartner Australasia's confidential information." Id. at 97.

On September 18, 2020, Gartner moved to disqualify NRFUS from representing the defendants in the consolidated Texas action, Gartner, No. 4:20-cv-1850, ECF No. 46, and on September 25, 2020, Gartner made the present motion to disqualify NRFUS in this Court, ECF No. 41. The action in this Court was put on hold pending the Texas court's decision on Gartner's open motion to dismiss. On July 21, 2021, the Texas court dismissed USSIC's lawsuit for lack of personal jurisdiction. See Gartner, No. 4:20-cv-1850, ECF No. 67. Thereafter, this Court stayed this action pending resolution of the plaintiff's motion to disqualify. ECF No. 61. On November 8, 2021, this Court held an evidentiary hearing on the motion, and the motion is now ready to be decided.

## II.

The district court retains broad discretion in deciding a motion to disqualify. See Allegaert v. Perot, 565 F.2d 246, 248, 251 (2d Cir. 1977). The party seeking disqualification must satisfy a high standard of proof before the court will grant disqualification. Evans v. Artek Sys. Corp., 715 F.2d 788, 791

(2d Cir. 1983). This is because motions to disqualify opposing counsel may impinge on parties' rights to employ the counsel of their choice, and are "often interposed for tactical reasons." Id. at 791-92. Moreover, "even when made in the best of faith," these motions "inevitably cause delay." Id. at 792. Accordingly, a motion to disqualify will be granted only if the facts present a real risk that the trial will be tainted. Bd. of Educ. v. Nyquist, 590 F.2d 1241, 1246 (2d Cir. 1979).

"The standard for disqualification varies depending on whether the representation is concurrent or successive." Hempstead Video, Inc. v. Inc. Vill. of Valley Stream, 409 F.3d 127, 133 (2d Cir. 2005). Representation is concurrent when an attorney simultaneously represents one client in a matter adverse to another client, and it is successive when an attorney previously represented the party opposing the attorney's current client. See id. In this circuit, concurrent representation conflicts are "prima facie improper." Id. Accordingly, where the movant has satisfied its burden of demonstrating that such a conflict exists, the burden on the motion shifts to the attorney opposing disqualification to "show, at the very least, that there will be no actual or apparent conflict in loyalties or diminution in the vigor of his representation." Hempstead, 409 F.3d at 133; see also Brown & Williamson Tobacco Corp. v. Pataki, 152 F. Supp. 2d 276, 281 (S.D.N.Y. 2001). While this is

a heavy burden, see GSI Com. Sols., Inc. v. BabyCenter, L.L.C., 618 F.3d 204, 209 (2d Cir. 2010), the court of appeals has found that it has been met, see, e.g., Victorinox AG v. B&F Sys., Inc., 709 F. App'x 44, 53 (2d Cir. 2017), as amended (Oct. 4, 2017); see also HLP Props., LLC v. Consol. Edison Co. of N.Y., No. 14-cv-01383, 2014 WL 5285926, at *5-6 (S.D.N.Y. Oct. 16, 2014); Brown & Williamson, 152 F. Supp. 2d at 288-91. "Courts should inquire on the facts of the case before them whether the practices and structures in place are sufficient to avoid disqualifying taint." Victorinox, 709 F. App'x at 53.

### III.

Whether NRFUS ought to be disqualified in this case depends on three main considerations: (1) whether a concurrent conflict of interest existed between NRFUS and Gartner Australasia at the time this dispute arose; (2) whether Gartner can demonstrate that it is sufficiently integrated with Gartner Australasia, such that the two entities should be treated as one for conflicts purposes; and (3) if a concurrent conflict between the parties to this case arose, whether the defendants can demonstrate that the trial process will not be tainted by NRFUS's conflict with Gartner. These are considered in turn.

### A.

First, a concurrent conflict of interest existed between NRFUS and Gartner Australasia when the dispute between USSIC and

Gartner arose. Gartner Australasia retained NRFA to advise it on COVID-19 related layoffs and furloughs in April 2020. This work was ongoing until at least June 2020 when Gartner Australasia stopped giving new assignments to NRFA — and possibly later, given NRFA's representation that, on August 14, 2020, Gartner Australasia's matter concerning COVID-19-related redundancies was "open" with their firm. See ECF No. 42-19. But whatever the scope and contours of their relationship on May 27, 2020, there is no doubt that when NRFUS filed the Texas actions against Gartner on behalf of USSIC on this date, Gartner Australasia was a current client of NRFA. NRFA has admitted as much. Id. A concurrent conflict of interest between Gartner Australasia and NRFUS therefore existed at the time that this dispute arose.

It is true that NRFUS is formally a separate entity from NRFA and other members of NRF. However, NRFUS disclaimed any reliance on its verein structure in its opposition brief on this motion. See Defs.' Opp. 2 n.3, ECF No. 43 ("NRFUS does not seek to oppose Gartner, Inc.'s Motion based on this legal issue."). Indeed, NRFUS explicitly "assume[d] that for conflicts purposes the activities of each of the international member firms in the Norton Rose Fulbright verein should be imputed to all the others." Id. (emphasis added). As such, the rules governing concurrent conflicts of interest apply as between all of NRF and Gartner Australasia. The question on this motion therefore

becomes whether Gartner and Gartner Australasia should be
treated as one entity for conflicts purposes.

**B.**

Gartner has met its burden of demonstrating that it is
sufficiently integrated with Gartner Australasia, such that they
should be treated as one entity for conflicts purposes.

The rules governing concurrent or successive representation
conflicts may apply where the relevant representation is adverse
to a client's corporate affiliate, such as a parent or
subsidiary. See BabyCenter, 618 F.3d at 210. In BabyCenter, the
court of appeals stated that there are two main factors relevant
to whether such a "corporate affiliate" conflict exists: (1) the
"degree of operational commonality between affiliated entities,"
and (2) the "extent to which one [entity] depends financially on
the other." Id. To determine whether there is a sufficient
degree of operational commonality between affiliated entities,
courts have considered the "extent to which entities rely on a
common infrastructure," including whether the entities share the
same computer network, e-mail system, travel department, and
health benefit plan; have integrated technology systems; rely on
or share common personnel; and, importantly, share a legal
department. Id. at 210-11 (collecting cases). As to the second
factor — financial interdependence — courts have considered the
"extent to which an adverse outcome in the matter at issue would

11

result in substantial and measurable loss to the client or its affiliate," while other courts have considered the entities' ownership structure. Id. at 211.

In this case, there is a sufficient degree of operational commonality, as well as a sufficient degree of financial interdependence, between Gartner and Gartner Australasia, so that Gartner and Gartner Australasia should be treated as one entity for conflicts purposes.

First, the operations of Gartner and Gartner Australasia are sufficiently centralized. Gartner and Gartner Australasia maintain a single e-mail system, insurance program, audit program, data privacy function, finance program, and compliance function. They also share corporate policies and an IT system. Most importantly, Gartner and Gartner Australasia have a shared legal department. Gartner's entire legal team — that is, the legal team at both Gartner, the parent, and the Gartner subsidiaries, like Gartner Australasia — is led by Mr. Kaufman and the global counsel who work directly under him, such as Ms. Frederick. The global counsel operate by subject matter, as opposed to geography, and supervise the relevant work of Gartner subsidiaries' in-house counsel, wherever they may operate. These global counsel, though technically employees at Gartner, the parent, work across the Gartner family of companies, and are directly involved in the Gartner subsidiaries' legal matters, as

Ms. Frederick's engagement in Gartner Australasia's legal troubles indicates.

It is true that Gartner Australasia retains its own corporate separateness, and that it has its own general counsel. However, in particular because of the integration of the relevant legal departments, the balance tips in favor of finding sufficient operational commonality. See id. (collecting cases for the proposition that shared responsibility for both the provision and management of legal services is a central factor); Hartford Acc. & Indem. Co. v. RJR Nabisco, Inc., 721 F. Supp. 534, 540 (S.D.N.Y. 1989) (finding that the parent and subsidiary should be treated as one because, "[c]ertain aspects of their separate corporate identities notwithstanding, the parent attached considerable importance to the product liability litigation against its subsidiary and, accordingly, supervised the subsidiary's litigation"). Indeed, even though Ms. Tracy operates independently from time to time, she remains supervised by the legal team at Gartner, which aims to maintain a centralized legal department. On these facts, finding sufficient commonality would reflect the view underlying the corporate affiliate doctrine that "neither management nor in-house legal counsel should, without their consent, have to place their trust in outside counsel in one matter while opposing the same counsel in another." See BabyCenter, 618 F.3d at 211.

Second, Gartner and Gartner Australasia are sufficiently financially interdependent because the outcome of this litigation would impact Gartner Australasia. See id. Gartner Australasia, like other Gartner subsidiaries, relies on Gartner for many aspects of its day-to-day operations, and a financial loss to Gartner would therefore affect Gartner Australasia. And the very fact that Gartner is seeking in this litigation to recoup, among other things, the costs of having to cancel conferences in Australasia underlines the financial interdependence of the entities.[2]

On the whole, based on the evidence presented at the hearing and in the submissions, Gartner has met its burden of establishing that there is sufficient operational commonality and financial interdependence between Gartner and Gartner Australasia. Accordingly, Gartner can rely on the conflict of interest between NRFA and Gartner Australasia as the basis for its disqualification motion of NRFFUS.

### C.

Because a concurrent conflict of interest therefore existed between the defendants' attorneys and Gartner at the time that

---

[2] While Gartner Australasia represents less than 5% of Gartner's revenue, see Defs.' Proposed Findings of Fact and Conclusions of Law 13, ECF No. 83, this is not dispositive, see BabyCenter, 618 F.3d at 212 n.1 (noting that while the subsidiary in that case was one of many of the parent's affiliates, and did not account for much of the parent's revenue, "the district court did not abuse its discretion in giving [that] counter factor[] little weight" given the extent of the entities' operational commonality).

this dispute arose, the burden on this motion to disqualify is borne by the defendants. See Victorinox, 709 F. App'x at 53. Courts in this circuit have found this burden to be satisfied where the attorney shows, among other things, that its client in the current matter has no doubts about the strength of its representation; that no confidential information from the previous representation will be relevant; that there is sufficient assurance that any confidential information of the complaining client will not be used against it; and, where a law firm as opposed to an individual attorney is at issue, that the current case involves different subject matters, attorneys, legal offices, and legal entities (for example, a parent and subsidiary) from those previously undertaken by the firm on behalf of the movant. See HLP Props., 2014 WL 5285926, at *5 (denying motion based on these factors); Victorinox AG v. The B & F Sys., Inc., 200 F. Supp. 3d 423, 427 (S.D.N.Y. 2016) (denying motion where there was "no exchange of pertinent information relating to this case," the representations were "very substantially different," and a "wall" was created to separate the relevant litigation teams), aff'd sub nom. Victorinox AG v. B&F Sys., Inc., 709 F. App'x 44 (2d Cir. 2017), as amended (Oct. 4, 2017).

So, too, here. While NRFUS should have obtained a waiver from Gartner Australasia or Gartner when it undertook to

represent USSIC, that conduct does not warrant disqualification on the facts of this case. See HLP Props., 2014 WL 5285926, at *5.

First, there are no "serious questions of access by counsel to an adversary's privileged information," Maiden Lane Hosp. Grp. LLC v. Beck by David Cos., Inc., No. 18-cv-7476, 2019 WL 2417253, at *4 (S.D.N.Y. June 10, 2019), and, moreover, a screen is plainly effective in this case, see Victorinox, 200 F. Supp. 3d at 427. NRFA's representation of Gartner Australasia regarding COVID-19-related layoffs and furloughs is not relevant to this case, and this is true even if Gartner truly intends to file an additional claim for coverage for these furloughs and layoffs. Whether and what Gartner Australasia was legally required to pay terminated or furloughed employees because of COVID-19 — the subject of NRFA's representation — is a substantively different question from the scope of Gartner's insurance coverage — the subject of this dispute. Further, Gartner has not yet submitted a claim for these terminations and furloughs, although it has already sought $280 million in losses. Separately, even though Gartner argues that NRFUS is now privy to information about when and how much it knew about the effects of COVID-19 in April 2020 — information it claims is relevant to the defendants' defense in this case — Gartner has not explained why this is so. As Gartner noted at the

16

evidentiary hearing, the "world" was aware of the consequences of COVID-19 by March 2020, and the fact that, as a consequence, Gartner was forced to lay off or furlough employees is in the record of this case. There is no evidence that confidential information from the previous representation will be relevant to this case. This weighs against disqualification. See Victorinox, 709 F. App'x at 53; HLP Props., 2014 WL 5285926, at *5; Brown & Williamson, 152 F. Supp. 2d at 288.

Moreover, NRFUS has met its burden of rebutting the presumption that confidences would be shared within the NRF verein, see Hempstead, 409 F.3d at 133, and this also weighs against disqualification, see Victorinox, 200 F. Supp. 3d at 427. As of June 4, 2020, NRFA had "measures . . . in place to ensure that those providing assistance to the insurance company [could not] access information provided to [NRFA] during the course of other matters." ECF No. 42-16, at 1. On August 14, 2020, NRFA again undertook that "information barriers" had been established to ensure that "Gartner Australasia's confidential information [would] not be disclosed to NRFUS," ECF No. 42-19, at 2, and these undertakings were reiterated at the evidentiary hearing. Importantly, there is no reason to doubt the efficacy of these measures. NRF's massive size, and the "de facto separation" between the NRFA team and the NRFUS attorneys on this case make inadvertent disclosures unlikely. See Intelli-

Check, Inc. v. Tricom Card Techs., Inc., No. 03-cv-3706, 2008 WL
4682433, at *5 (E.D.N.Y. Oct. 21, 2008); see also Reilly v.
Comp. Assocs. Long-Term Dis. Plan, 423 F. Supp. 2d 5, 11
(E.D.N.Y. 2006) ("[P]hysical separation . . . substantially
reduces the chances of inadvertent disclosure and strengthens
the physical aspects of the screen."). And while NRFUS does not
rely on NRF's verein structure to argue that NRFA's conflicts
cannot be imputed to its office as a matter of law, the fact
that the firms are legally separate entities bolsters the
conclusion that a screen is effective. This further weighs
against disqualification.[3]

Second, the timing and circumstances of Gartner's motion
suggest that tactical considerations may have played a role.
Gartner's counsel was willing to discuss waiving the conflict of
interest if the defendants agreed to transfer the Texas actions
to New York. This apparent willingness undercuts Gartner's claim
that it believes the conflict of interest in this case will so
taint the integrity of the trial process that the harsh remedy
of disqualification is warranted. Additionally, Gartner's

---

[3] While it is true that NRFA and NRFUS did not immediately erect a screen
after learning of the potential conflict of interest with Gartner, the
implementation of a late screen is not fatal. See, e.g., Plumbing Supply, LLC
v. ExxonMobil Oil Corp., No. 14-cv-3674, 2014 WL 6644221, at *7 (S.D.N.Y.
Oct. 23, 2014). This is particularly true where, as here, there is nothing to
suggest that the attorneys at issue had already been exposed to confidential
information, or that the late screen caused any harm to Gartner's interests.
See id.

argument that it intends to bring a new insurance claim against the defendants to cover the costs of its furloughs and/or layoffs in Australasia smacks of litigation tactics. Gartner suggested that it intended to bring this claim for the first time during this litigation, months after it submitted its initial claim to USSIC. See ECF No. 65 (Gartner noting for the first time that it intended to bring this claim). This occurred despite the fact that, under Gartner's policy, Gartner is required to submit a claim "as soon as practicable." Tr. 87. And still to this day, Gartner has failed to submit such a claim. This timing — as well as the fact that Gartner may not be permitted to pursue this claim given the amount of the claims it has already submitted — suggests that Gartner's motion to disqualify may be at least partially motivated by tactical considerations. The Court may appropriately consider this as weighing against disqualification. See HLP Props., 2014 WL 5285926, at *6; Brown & Williamson, 152 F. Supp. 2d at 290-91.

Finally, serious prejudice would befall the defendants if NRFUS would be disqualified at this stage, and this should also be considered on this motion. See HLP Props., 2014 WL 5285926, at *6. The defendants in this case have expressed no doubt whatsoever in their confidence in NRFUS. To the contrary, the defendants very much seek — both for financial reasons and for the reason that NRFUS has represented them in similar matters —

for NRFUS to represent them in this case. See Tr. 116-17. They would be prejudiced if they had to restart anew with a new litigation team. Id.; cf. HLP Prop., 2014 WL 5285926, at *6; Brown & Williamson, 152 F. Supp. 2d at 289. By contrast, there is no evidence that Gartner would be prejudiced by NRFUS's continued representation of the defendants in this case.

### CONCLUSION

The foregoing constitutes the Court's findings of fact and conclusions of law. Considering all of the above factors, the defendants have met their burden of demonstrating that the trial process in this case will not be tainted by NRFUS's representation of the defendants in this case. Gartner's motion to disqualify NRFUS is therefore **denied.**

The Court has considered all of the arguments of the parties. To the extent not discussed above, the arguments are either moot or without merit.

The Clerk is directed to close Docket No. 41. The stay in this case, ECF No. 61, is lifted.


**SO ORDERED.**

Dated:     New York, New York
           January 14, 2022

                                    _____
                                       John G. Koeltl
                              United States District Judge


20