**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

GARTNER, INC.,
Plaintiff,

v.

HCC SPECIALTY UNDERWRITERS, INC.
and U.S. SPECIALTY INSURANCE
COMPANY,
Defendants.

No. 1:20-cv-4885 (JGK) (JLC)

**SECOND AMENDED COMPLAINT**
**AND JURY DEMAND**

Plaintiff Gartner, Inc. ("Gartner"), by and through its undersigned counsel, for its Second

Amended Complaint against Defendants HCC Specialty Underwriters, Inc. ("Specialty

Underwriters") and U.S. Specialty Insurance Company ("USSIC"), hereby alleges as follows:

**SUMMARY OF ACTION**

1.       This is an action by Gartner for declaratory relief, breach of contract, breach of

the covenant of good faith and fair dealing, unfair claims settlement practices, and unfair trade

practices arising out of Defendants' failure to fulfill their promises and obligations under "event

cancellation" policies that expressly cover losses from communicable diseases such as Covid-19.

The policies were negotiated and underwritten by Specialty Underwriters, as agent for its

affiliate, USSIC, as the insurer.

2.       Gartner stages annual events and conferences (referred to in the policies at issue

as "Shows" and used interchangeably herein) throughout the world for IT and other

professionals.  Gartner plans and schedules these events well in advance of their actual date.

Because these conferences and events are a profitable component of its overall business, for

many years Gartner has purchased insurance to cover the risk that its events and conferences

would be cancelled and the revenue generated by them lost.  Gartner's event cancellation

policies sold by Defendants therefore expressly covered Gartner's losses arising from cancellation of its events.  Since 2007, Specialty Underwriters has negotiated on behalf of its affiliated companies, including USSIC, to underwrite Gartner's event cancellation coverage.

3.      For many years prior to and including 2020, the policies that Specialty Underwriters negotiated and sold to Gartner specifically included "Communicable Disease" coverage, which provides insurance against "loss … of whatsoever nature directly or indirectly caused by, resulting from or in connection with any outbreak of communicable disease (whether actual or perceived) regardless of any other cause contributing concurrently or in any sequence to the loss."

4.      Since 2007, Specialty Underwriters has also included in the policies a provision permitting Gartner to "reinstate" the total annual limit of liability (but only so much of it as Gartner might need) by paying a pre-determined additional premium, thus doubling the initial limits if necessary to cover Gartner's losses.

5.      Finally, each of the policies (other than the newly issued Evanta policy described below) was effective for approximately two years, thereby insuring Gartner's events for each year of the multi-year policy.  Defendants issued the policies with an initial schedule of events, listing the events insured under the prior policy, thereby confirming coverage for those events under the renewal policy at the premium rate stated in the policy.  The policies and past practice also provided that Gartner could and would submit an updated schedule of events in the first quarter of each policy year reflecting (i) events that Gartner had not put on in the past but planned to put on during the new policy period, (ii) increased gross revenue estimates for its recurring annual events, and (iii) other adjustments to its schedule.  These changes were routinely accepted by Defendants.  Prior to 2020, Defendants had not rejected coverage of a

show identified in Gartner's schedule or informed Gartner that they believed they could reject coverage for the shows on Gartner's schedule.

6.      When Covid-19 began to spread worldwide in 2020, Gartner was forced to begin cancelling its planned and insured events and turned to Defendants for coverage.  After years of accepting millions of dollars in premiums and accepting Gartner's annual schedules of events, Defendants responded to Gartner's cancellations of its 2020 events and requests for coverage by saying that Gartner: (a) may not reinstate the aggregate limits of liability, despite express provisions of the policies permitting Gartner to do so; (b) may not increase the revenue projections for various individual events (and thus the coverage available for those events) beyond the estimated revenues from the prior year, despite routinely accepting Gartner's increased projections in the past; (c) may not add new shows to the schedules for 2020 even though these shows were planned long before the Covid-19 pandemic, and even though Defendants had routinely accepted the addition of newly planned shows in the past; and (d) is not entitled to coverage for *any* event that had been scheduled to take place in 2021 but had to be cancelled because of the pandemic, even though Defendants sold Gartner a two-year policy covering events that were planned for both 2020 and 2021, and even though the policies expressly covered any loss due to an actual or perceived risk of communicable disease, such as Covid-19.  Defendants also acted unfairly, deceptively and in bad faith by misstating the provisions of the policies, by requiring Gartner to submit substantially more detailed information than necessary to adjust Gartner's claim, and by substantially delaying payment for the portions of the loss that was not disputed.

## **PARTIES**

7.      Plaintiff, Gartner, Inc. (formerly known as Gartner Group, Inc.), is a publicly traded global research and advisory firm incorporated in Delaware with its principal place of

3

business in Stamford, Connecticut.  Gartner hosts conferences and events worldwide connecting leaders in information technology, finance, human resources, customer service and support, legal and compliance, marketing, sales, and supply chain functions.  These events also serve as a venue to demonstrate the value of Gartner's research and advisory subscription services to clients and potential clients.

8.      Defendant, HCC Specialty Underwriters, Inc., is a Massachusetts corporation with its principal place of business in Wakefield, Massachusetts.  It is licensed by the Commonwealth of Massachusetts as (i) an insurance agency, (ii) an insurance producer, and (iii) a reinsurance intermediary. Specialty Underwriters is also authorized to do business and does business in New York as a foreign corporation and is licensed as an insurance broker and agent in New York.

9.      Specialty Underwriters operates under the marketing umbrella of the Tokio Marine HCC group of companies, under the trade name Tokio Marine HCC– Specialty Group, and negotiates and serves as the underwriting arm of various insurance companies in the group, including USSIC.  Specialty Underwriters advertises itself as having expertise in underwriting event cancellation insurance.  At all relevant times, Specialty Underwriters was the Managing General Agent for USSIC and had both actual and apparent authority to act on behalf of USSIC with respect to the negotiation, issuance, and sale of the USSIC event cancellation policies insuring Gartner's events and with respect to handling claims under those policies.

10.     Defendant, U.S. Specialty Insurance Company, is an insurance company incorporated in Texas, with its principal place of business in Houston, Texas.  USSIC is authorized to do and does business in New York as a foreign corporation and is licensed and authorized to issue insurance in New York.

**JURISDICTION AND VENUE**

11.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C.

§§ 1332(a) and 2201 because there is complete diversity of citizenship between the parties, and

the amount in controversy exceeds $75,000, exclusive of interest and costs.

12.     This Court has personal jurisdiction over Defendants under N.Y. C.P.L.R. § 302.

13.     Venue is proper under 28 U.S.C. § 1391(b)(2).

**FACTS**

14.     For many years, Gartner has hosted upwards of 60-70 "destination" conferences

and events (large, multi-day conferences, referred to in the policies as "shows") for business

professionals held annually in cities across the globe (the "Destination Shows").  These events

draw international attendees, exhibitors, and speakers.

15.     In or around 2017, Gartner acquired the Evanta line of conferences (the "Evanta

Shows"), which were smaller than the Destination Shows.  In 2019, Gartner decided to insure

these Evanta Shows beginning in June of 2019.  In addition to being profitable in their own right,

both the Destination Shows and the Evanta Shows enhance Gartner's brand and help to cross-sell

other Gartner products.  In particular, Gartner's Destination Shows serve as an important venue

to demonstrate the value of Gartner's research and advisory subscription services to current and

potential subscribers of these services.  Because the conference segment of Gartner's business is

profitable, Gartner has long insured against losses that may result from the cancellation of its

events.

16.     Gartner purchased two policies that are the subject of this lawsuit: (i) the

"Destination Policy" covering the Destination Shows, including those shows it was forced to

cancel in 2020 and 2021 because of the pandemic; and (ii) the "Evanta Policy" covering the

Evanta Shows, including those shows Gartner was forced to cancel in 2020 because of the pandemic (together, the "Policies"). Both Policies cover losses due to the cancellation of a show and include essentially the same key terms, including a reinstatement of limits provision.

17.     In addition, both Policies expressly provide coverage for additional losses and expenses, including loss due to a communicable disease, in addition to the loss of revenue from the cancellation of shows, stating:

> COMMUNICABLE DISEASE – This insurance is to indemnify the insured for any loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any outbreak of communicable disease (whether actual or perceived) regardless of any other cause contributing concurrently or in any sequence to the loss.

### *Evolution of the Destination Policy*

18.     Aon/Albert G. Ruben Insurance Services, Inc. ("Aon") has been Gartner's insurance broker since 2007, and since that time has negotiated the terms and conditions of Gartner's event cancellation coverage with Specialty Underwriters. Neither Aon nor Gartner ever negotiated directly with USSIC regarding the terms of its event cancellation policies; rather, all of the terms were negotiated with Specialty Underwriters in Massachusetts. USSIC remitted its invoices for the policy premiums to Aon, which in turn submitted its corresponding invoices to Gartner in Connecticut for payment. Gartner reviewed and approved the invoices in Connecticut, and then sent payment to Aon.

19.     Prior to late 2007, Gartner had event cancellation coverage under a policy issued by various Lloyd's syndicates (the "Lloyd's Policy") brokered by Marsh. A copy of the Lloyd's Policy form is attached as Exhibit A. Subsequent to the issuance of that policy, Aon replaced Marsh as Gartner's broker and solicited a competing bid for replacement coverage from Specialty Underwriters. On information and belief, Specialty Underwriters was aware of the

terms and conditions of the Lloyd's Policy when it made a proposal to insure Gartner for the period November 1, 2007 through September 1, 2009.

20.    When Gartner purchased a policy to incept after the Lloyd's coverage expired, it had had no claims under its event cancellation coverage for several years.  Specialty Underwriters was or should have been aware of this loss history.  To compete for the business, Specialty Underwriters offered Gartner several coverage options.  The option chosen by Gartner came with a lower initial aggregate limit of liability, but gave Gartner an absolute, unilateral right — at its sole option, at a pre-negotiated premium rate — to "reinstate" as much of the annual aggregate limits as Gartner might need to cover the cancellation of additional shows on its schedule if the initial limits were exhausted.  This reinstatement right guaranteed that if Gartner needed additional coverage, it would be available and could be triggered for a pre-set premium, thus ensuring that Gartner had access to double the initial annual limit for each policy year, as specifically provided for in the policy's reinstatement provision.

21.    On information and belief, when Specialty Underwriters prepared a draft of the 2007-2009 policy, it had in its possession and reviewed Gartner's expiring Lloyd's Policy. The Lloyd's Policy included the following reinstatement of limits clause:

> **Reinstatement of Original Limit of Indemnity**
>
> This Section of this Insurance is extended to cover an Event if it is Postponed, Relocated or rescheduled. Any reduction in the Limit of Indemnity for the Postponed, Relocated or rescheduled Event by way of a Loss payment for the original Event can be reinstated up to the original Limit of Indemnity at pro rata of the applicable premium for the original Event subject to agreement by Underwriters.

22.    The reinstatement of limits clause in the Lloyd's Policy permitted Gartner to reinstate the limit for a particular event only if that event was "Postponed, Relocated or rescheduled," but not if the event was cancelled, even though the Lloyd's Policy covered losses

due to cancellation of an event as well as the postponement, rescheduling or relocation of an event.  Specialty Underwriters initially proposed a reinstatement provision that mirrored the provision in the Lloyd's Policy.  It was rejected by Gartner.

23.     Specialty Underwriters then drafted a proposed policy form for Gartner's 2007-2009 policy containing the following:

> *Reinstatement of Original Limit of Liability*
>
> This insurance is extended to cover a **Show** if it is Cancelled, Abandoned, Postponed, Interrupted, Curtailed or Relocated. The **Company** agrees to reinstate that part of the Limit of Indemnity shown in the Schedule utilized by way of any potential or actual Loss payment under this Insurance at the sole option of the Insured. If the Insured opts to reinstate the Limit of Indemnity then the additional premium payable is calculated at 100% of the original premium multiplied by that proportion of the Limit of Indemnity reinstated. Furthermore, if the Limit of Indemnity reinstated exceeds the ultimate settled Loss then the Company agrees to a return premium for the difference calculated in accordance with the foregoing. The maximum amount that can be reinstated shall not exceed $50,000,000.

24.     Unlike the Lloyds' Policy, the reinstatement of limits clause in the policy ultimately agreed to and issued by Specialty Underwriters permitted reinstatement of limits that were depleted by loss due to, *inter alia*, the "cancellation" of events.

25.     This broader reinstatement of limits clause was then included in the 2007-2009 policy issued to Gartner and in each of the subsequent event cancellation policies underwritten by Specialty Underwriters, including the USSIC policy covering cancellation of events in 2020 and 2021, with the only change being increases to the amount of the limit that could be reinstated to coincide with the initial annual aggregate limit.

26.      Specialty Underwriters was aware or should have been aware by 2019 that the events for which Gartner sought coverage from Defendants consisted almost entirely of annual, recurring shows that were planned and needed to be planned far in advance of the event, and that

if a Gartner show had to be "cancelled," that show would not take place during the policy year.

Therefore, if reinstated limits due to losses for a "cancelled" event could only be used for the

same show in the same year in which that show was cancelled, as Defendants now contend, the

Policies' reinstatement of limits provision for a cancelled show would be illusory.  Defendants

never disclosed their position on when and how Gartner could use reinstated limits when Gartner

was choosing among the options for coverage offered by Specialty Underwriters in 2007 or

purchasing its subsequent event cancellation policies; indeed, Defendants did not do so until after

Gartner sought to exercise the Policies' reinstatement of limits for a cancelled show clause after

Gartner was forced to cancel events due to the pandemic.

27.     In 2007, Specialty Underwriters did not, when offering Gartner the option of

choosing between limits of liability of $149 million or $50 million with a right to reinstate up to

$50 million, advise Gartner either that: (i) reinstatement would not be available once Gartner's

losses in a given period exceeded the policy aggregate for that period, or that (ii) reinstatement

was only available for the second iteration of a cancelled show and only for that show and not for

another show on Gartner's calendar.  Nor did Defendants ever advise Gartner of that position

when they sold Gartner subsequent event cancellation coverage with the same reinstatement of

limits clause.  Gartner relied on the representation that the full aggregate limit could be reinstated

to cover any show, and the Defendants' failure to disclose their actual intent.  Had Gartner been

advised of the position Defendants are now taking on reinstatement, it would not have selected

the option with the lower limits with the right to reinstate coverage.

28.     The reinstatement of limits clause in the policies underwritten by Specialty

Underwriters on behalf of its affiliates giving Gartner "the sole option" to reinstate "any part" of

the limits "utilized by way of any potential or actual Loss payment," including for loss due to the

cancellation of a show, was a key provision for Gartner when selecting coverage to replace the Lloyd's Policy and for each of the policies it purchased from Specialty Underwriters.

29.     The limits of the Destination Policy that can be reinstated at Gartner's "sole option" for 2020 and 2021 are $150,000,000 for each year of the two-year policy.  The limits of the Evanta Policy that can be reinstated at Gartner's "sole option" are $20,000,000. Other than paying the pre-set premium, there were no restrictions placed on Gartner's right to use the full reinstated limits of coverage under the Destination Policy for each of the years 2020 and 2021, or on Gartner's right to use the full reinstated limits of coverage under the Evanta Policy for any show on the schedule of shows tendered to Defendants.

30.     The Destination Policy states an estimated yearly premium of $1,413,670, which was, initially and preliminarily, based upon the 2019 budgeted revenues for the Destination Shows, which for the Destination Policy were the shows to be insured in 2020 and 2021. These shows had previously been insured by USSIC in 2019.  Consistent with the language of the Policies and the parties' course of dealing since 2007, Gartner could add new shows to the 2020 and 2021 schedules for the Destination Policy that did not appear on the 2019 schedule, and could budget increased revenues for recurring events.  Accordingly, the Destination Policy provided that Gartner would submit in the early part of 2020 an updated Schedule of Events to be covered in 2020 and the anticipated revenue for those events, and would submit in the early part of 2021 an updated Schedule of Events to be covered in 2021 and the anticipated revenue for those events.

31.     As in prior years, Gartner's addition of new events and increases in projected revenues for 2020 and 2021 events (above the revenues generated by Gartner in 2019) resulted in a higher base on which the premium was calculated, according to an agreed-upon formula.  Thus,

over the years, Defendants collected more premium as Gartner's revenues from its shows

increased.  As long as Defendants were not paying claims, this arrangement suited them just fine.

### *Terms of the Destination Policy*

32.     For the policy in effect from December 30, 2019 through December 31, 2021,

Specialty Underwriters placed the coverage for the Destination Shows with its related company,

USSIC.  That policy, the Destination Policy with the initial 2020 Schedule, is attached hereto as

Exhibit B.

33.     The Destination Policy insured Gartner's Destination Shows planned for 2020 and

2021.  It identifies Gartner's address as 291 Broadway, Suite 901, New York, New York, and

contains a notice that although the policy forms and rates are exempt from the New York

insurance regulator's filing requirements, they nevertheless "must meet the minimum standards

of the New York Insurance law and Regulations."

34.     Section I of the Destination Policy (Show Cancellation) provides, in relevant part,

that "[t]his insurance indemnifies the Insured against any non-excluded loss occurring

subsequent to the Effective Date resulting in the … **Cancellation, Curtailment, Postponement,**

**Interruption, Relocation/Removal to Alternative Premises, or Abandonment of a Show**" or

"**Enforced Reduced Attendance.**"

35.     The Destination Policy defines "**Cancellation, Curtailment, Postponement,**

**Interruption, Relocation/Removal to Alternative Premises, or Abandonment of a Show**" all

to mean "the inability of the Insured to open, keep open, or otherwise maintain the **Show** in

whole or in part for its original intent, scope and duration."

36.     The Declarations to the Destination Policy define the insured Shows for 2020 as

"As Per the Attached 2020 Schedule.  Actual 2020 Schedule of Shows to be reported by Feb. 1,

2020," and defines the insured Shows for 2021 as "Per the Attached 2021 Schedule.  Actual

2021 Schedule of Shows to be reported by Feb. 1, 2021." Thus, the Destination Policy insured all of Gartner's shows on Gartner's schedules for 2020 and 2021, upon payment of the designated premium.

37.     Nothing in the Destination Policy permits USSIC to decline to cover any show scheduled by Gartner or to restrict or limit coverage for a show other than the exclusions included in the Policy at its inception on December 30, 2019.

38.     Accordingly, the Destination Policy insures Gartner for the shows set forth in the 2020 Gartner schedule provided by Gartner on February 11, 2020.  The shows and events on this schedule were planned by the Policy's inception on December 30, 2019, and before Gartner understood it would have to cancel events and shows because of the outbreak of Covid-19.

39.     Similarly, the Destination Policy also covers Gartner's events planned for 2021 that were included on the schedule provided by Gartner on or before February 1, 2021, as set forth in the Policy.  The shows on the 2021 Schedule provided to Defendants were all events that Gartner would have held in the absence of the outbreak of Covid-19, or, in the case of the shows it still intended to hold during the second half of 2021 notwithstanding the pandemic or the subsequent emergence of the Delta variant of the Covid-19 virus.  Although Gartner planned its 2021 events long in advance of these annual events, Gartner relied upon the policy provision providing that it did not have to report its 2021 Schedule of Events to Defendants before February 1, 2021.  Had Defendants advised Gartner that Defendants were going to assert that they were not going to insure events that had been cancelled before the delivery of the schedule, Gartner could and would have provided the schedule of 2021 shows well in advance of when Gartner decided to cancel the 2021 shows on the schedule delivered to Defendants on or about February 1, 2021.

40.    Key features of the Destination Policy give Gartner two separate and independent rights: the right to (a) increase the limits of indemnity for particular shows, and (b) reinstate the aggregate limit.

41.    First, the Destination Policy permits Gartner to increase the amount of insurance reflected in the schedule for a particular show before it takes place, stating:

> *Increase in Limits of Indemnity*
>
> It is understood and agreed that the Aggregate Limit of Indemnity is a loss limit and may not be sufficient to cover the aggregate value of all **Shows**. At any time prior to commencement of a **Show** or **Shows** the Insured can apply in writing for increased indemnity limits based upon revised financial estimates of **Gross Revenues, Expenses** or **Commitments**, provided that there is no circumstance(s) known by the insured which may give rise to a claim with respect to such **Show** or **Shows** declared to this insurance. … It is understood and agreed that if **Gross Revenue, Expenses** or **Commitments** for any one, several or all **Shows** … increases in value by a factor of 10% or less, there will be no change in premium and the Limit of Indemnity for any one, several or all **Shows** … automatically increase accordingly.

42.    Thus Gartner has the right to increase the limit for particular events before they occur, if Gartner's revenue expectations for those events increased over the amounts reflected on the schedule provided to Specialty Underwriters.

43.    Second, pursuant to the policy language and the consistent course of dealing between the parties, Defendants understood and agreed that Gartner could increase the limits available for a particular show when it provided an updated schedule of events to Specialty Underwriters if the projected revenue for that show increased beyond the amount projected in the Destination Policy's initial schedule of events.

44.    The Destination Policy also permits Gartner to add new shows to its schedules, stating under "Extensions of Coverage" that:

> NEWLY ORGANIZED **SHOW** – Subject to a limit of indemnity of $2,000,000 Insurers agree to provide automatic coverage for up to 90 days for any newly organized or acquired **Show**(s). The Insured will provide

insurers with the specifics of the new **Show** and coverage shall be scheduled and a premium charge made at the agreed composite premium rate evidenced on the Declarations page.

45.     Defendants did not object to Gartner increasing revenues or adding new events to its schedules from 2008 until Gartner provided schedules in 2020, when Defendants understood Gartner might have to cancel shows because of Covid-19 and seek payments under the Policies for the first time from Defendants.

46.     The third way for Gartner to increase the amount of insurance for events planned for 2020 and 2021 is a provision that permits Gartner to access more than the initial $150,000,000 in annual aggregate limits if Gartner needs to do so because Gartner's losses from cancellations of events planned for 2020 or 2021 would exceed $150,000,000. Defendants agreed that for 2020 and 2021 Gartner would be entitled to increase the total aggregate limit by up to an additional $150,000,000 per year, for a potential total aggregate limit of $300,000,000 for each year.  In particular, the Destination Policy includes the same language drafted by Specialty Underwriters when it sought to obtain Gartner's business in 2007, quoted in Paragraph 23 above, except that the original annual limit that Gartner could reinstate had increased to $150,000,000.

47.     The Destination Policy therefore gives Gartner the right to increase the Limit of Indemnity for any particular show, as well as the right to "reinstate" — *i.e.*, double — the aggregate limit of $150,000,000 in the event Gartner's losses in 2020 or 2021 exceed that initial aggregate limit.  Gartner's right to "increase" the amount of insurance for a particular show is independent of Gartner's right to also "reinstate" so much of the aggregate limit of $150,000,000 per year as it might need, subject only to the restriction that the "maximum amount that can be reinstated shall not exceed $150,000,000," for a total of $300,000,000 in coverage for 2020 and a

14

total of $300,000,000 for 2021.  Gartner bargained for both of these rights, and they had been part of Gartner's event cancellation policies and the parties' course of dealing for over a decade.

48.     Another key feature of the Destination Policy, which had been a part of Gartner's event cancellation policies underwritten by Specialty Underwriters since 2014, is its explicit, broad extension of coverage for any loss due to "Communicable Disease."

49.     The claims procedure under the Destination Policy requires the insured to give notice of the "happening or circumstance which gives rise to a claim" to Specialty Underwriters in Wakefield, Massachusetts, not to USSIC.

50.     The policies also provide:

> This insurance cannot be cancelled by the **Company** except for non-payment of premium.

Gartner paid all premiums due under the Destination Policy.

51.     Loss under the Show Cancellation coverage is determined as "the greater of":

(i)     the loss of **Gross Revenue** that would have been received in the absence of the covered loss, whether or not the insured is obligated by contract or otherwise to return such **Gross Revenue**, plus the insured's loss from **Commitments**, less recoveries made and any necessary **Expenses** not incurred. Pro-rata return of any part of **Gross Revenue** in connection with a **Show** shall be considered as loss of **Gross Revenue**; or

(ii)    the total of **Expenses** incurred plus loss of **Commitments,** less any recoveries obtained, and less **Gross Revenue** retained after refunds, whether or not the insured is obligated by contract or otherwise to return such **Gross Revenue**; and

(iii)   with respect to (i) and (ii) above the reasonable cost incurred, agreed, or committed by the Insured to avoid, diminish, or mitigate the extent, scope or possibility of a loss including costs to reschedule and or remarket a **Show**. Such costs include but are not limited to: extra expense, transportation, accommodation, **Commitments**, incentives, advertising, promotion, marketing and public relations **Expenses**. The cost of such action is in addition to the limit of liability.

52.     On February 11, 2020, Gartner provided Aon with an updated schedule for the Destination Shows that Gartner intended to host through December 31, 2020 to be insured under the Destination Policy, with an estimate of the expected revenue to be derived from each show. Under the terms of the Destination Policy and in keeping with the parties' course of dealing, Aon timely provided Specialty Underwriters with the 2020 Schedule.  The 2020 Schedule is attached hereto as Exhibit C.  After the policy was issued and after Gartner had to cancel some events due to Covid-19, Defendants responded by issuing a new "Coronavirus Exclusion" for two of the events for which USSIC charged and accepted premium that were included on Gartner's 2020 Schedule.  That Endorsement (Endorsement No. 5) purporting to amend the Destination Policy is attached hereto as Exhibit D.  Gartner also timely provided Specialty Underwriters with a schedule of the 2021 Destination events to be insured under the Destination Policy.

### *The Terms of the Evanta Policy*

53.     Evanta Shows are smaller in attendance and duration than Gartner's Destination Shows.

54.     Sometime after acquiring the Evanta events business, Gartner decided to insure the events put on by Evanta, which typically had revenues under $1,000,000.  Gartner first requested a quotation for the Evanta Policy in or around April 2019, providing Specialty Underwriters with a preliminary schedule of Evanta events for the last half of 2019.  Pursuant to the course of conduct between the parties, Gartner would submit an updated schedule for 2020 for the Evanta Policy in the spring of 2020, as it had done with the Destination Policy and its predecessor policies.

55.     In 2019, Specialty Underwriters, on behalf of USSIC, negotiated a policy with initial limits of $20,000,000 insuring the Evanta events, modelled closely after the Destination

Policy.  Thus, the Evanta Policy provided that for an additional premium, Gartner could reinstate the original $20,000,000 aggregate limit if Gartner needed to reinstate the initial aggregate limit due to actual or potential losses.

56.    The Evanta Policy is an eighteen-month policy.  USSIC, acting through Specialty Underwriters, sold Gartner this additional policy, effective June 15, 2019 through December 31, 2020, Policy No. U-19/7000957.  The Evanta Policy, together with the initial schedule for the first year of the eighteen-month policy, is attached hereto as Exhibit E.

57.    The Evanta Policy, like the Destination Policy, identifies Gartner's address as 291 Broadway, Suite 901, New York, New York, and contains a notice that although the policy forms and rates are exempt from the New York insurance regulator's filing requirements, they nevertheless "must meet the minimum standards of the New York Insurance law and Regulations."

58.     The terms of the Evanta Policy mirrored the Destination Policy, except with respect to the limits, premium, and Schedule of Events.  The Evanta Policy contains the same important features as the Destination Policy that give Gartner the right to increase the limits of indemnity for particular shows, to designate the scheduled shows and to reinstate the aggregate limit.  And, like the Destination Policy, the Evanta Policy expressly covered losses due to a communicable disease.

59.    Gartner provided its updated schedule of Evanta Shows to Aon to forward to Specialty Underwriters on or about March 2, 2020.  That schedule is attached hereto as Exhibit F.  Aon then submitted an updated 2020 schedule to Specialty Underwriters reflecting the updated information.  Gartner had planned these events to take place in 2020 long before Gartner provided the 2020 Evanta schedule to Aon to submit to Specialty Underwriters and before the

emergence of Covid-19.  The 2020 Evanta schedule includes recurring events planned by Gartner for the second half of 2020, whose 2019 iterations were included on the initial policy schedule, as well as shows that were planned by Gartner for the first half of 2020 and were already included on the Evanta Policy's initial schedule.  Consistent with its estimates of expected revenue and attendance growth, the 2020 Evanta schedule reflects higher revenues for the 2020 events than their 2019 iterations.  It also includes some new events, which were not recurrences of 2019 insured events, consistent with the parties' understanding that because the coverage for 2019 was not for a full year, events would be included for 2020 that were not included in the initial 2019, one-half year schedule.  Thus, Defendants knew and expected shows would be added by the time the 2020 Evanta schedule was finalized and given to Specialty Underwriters.

60.     The Evanta events planned for 2020 and included in the schedule for 2020 given to Defendants, both recurring and new, were expected to be profitable and/or beneficial to Gartner's business.  These events had been planned by Gartner before Gartner knew it might have to cancel them because of Covid-19.

61.     On or about August 12, 2020 (after USSIC sued Gartner in Texas), USSIC purported to endorse the Evanta Policy effective March 2, 2020 to add its version of the Evanta Schedule of Events for 2020 to the Evanta Policy.  A copy of that endorsement (Endorsement Number 3) and the accompanying schedule are attached hereto as Exhibit G.  At the same time,

USSIC also purported to endorse the Evanta Policy to add a new "Coronavirus Exclusion" (Endorsement Number 4), a copy of which is attached hereto as Exhibit H.

### *Gartner is Forced to Cancel Events*

62.     In late February 2020, as Covid-19 began to spread beyond China, Gartner was forced to begin postponing and cancelling events to protect the health and safety of its employees, contractors, and attendees — and in response to public advisories and governmental requests to limit travel and gatherings. After the World Health Organization declared Covid-19 a pandemic, and further restrictions on travel and public gatherings were imposed, Gartner was forced to cancel more of its events.

63.     These cancellations were necessary in the midst of a global public health crisis, and represented a substantial loss to Gartner's profitable and growing events business.  The resulting loss was squarely within the "Communicable Disease" coverage provided by the Destination and Evanta Policies, and Gartner, through Aon, promptly notified Specialty Underwriters of the cancellations.

64.     Specialty Underwriters responded to Gartner's notices by unreasonably refusing to acknowledge coverage, and instead demanding, through the agreed-upon adjustor retained by Specialty Underwriters, Hyperion Adjusters ("Hyperion"), that Gartner provide documentation regarding each individual event while Gartner was struggling with the pandemic's impact on its business and employees.  The information sought by Defendants from Gartner was wildly burdensome, and much of it unnecessary to adjust Gartner's losses.

65.     Gartner gave its first notice of a potential cancellation under the Destination Policy in late February 2020, reporting two events scheduled to be held in Tokyo and Dubai that

were in danger of cancellation because of travel advisories issued by various governments as a result of the emerging spread of Covid-19.

66.     Specialty Underwriters' Director of Contingency and SHEL Claims, Lorna Gillespie, responded to Gartner's notice on February 25, 2020, and assigned Hyperion to handle the matters, but did not acknowledge that either event would be covered by USSIC despite the rapidly worsening global health situation.  Indeed, she suggested that despite Gartner's "Communicable Disease" coverage, the cancellation of these events would not be covered.  She wrote, "We will continue to follow the situation in Dubai and Asia and any affect Coronavirus will have on future events.  For now, it seems travel to Dubai is only restricted if flying to/from Iran or through Bahrain. Otherwise, there shouldn't be any disruption to the event, other than any reduced attendance due to attendees in China, Bahrain, Italy, etc. that cannot get there due to travel restrictions."  She further stated (wrongfully) that "**[t]he policy would not respond to any cancellations/refunds arising out of fear of traveling, alone**."  This position was contrary to the language of the Destination and Evanta Policies providing coverage for loss indirectly or directly in connection with "any outbreak of communicable disease **(whether actual or perceived)**".  (Emphasis added.)

67.     Soon thereafter, Specialty Underwriters demanded to know the reasons for the cancellations.  This came as a surprise to Gartner given the nonstop news of Covid-19 and Gartner's repeated explanations that the only reason for cancelling its otherwise profitable events was the effects of Covid-19, which fell squarely within the Destination Policy's "Communicable Disease" coverage.

68.     After the February 25, 2020 Gillespie communication, Gartner was forced to cancel the Tokyo event (scheduled for February 27) in response to an advisory issued by the Japanese government in response to Covid-19.

69.     On March 3, 2020, Gartner informed Hyperion that the event in Dubai also had to be cancelled because, among other reasons, it required 74 Gartner employees and 31 contractors to travel to set up and run the event, risking their health and safety (along with that of the attendees) and presenting the possibility that some or all might need to be quarantined abroad.  In addition, many non-local attendees were from countries imposing travel restrictions.  In light of Specialty Underwriters' stated position that the policy would not respond to attendees' "fear of traveling," Gartner requested an immediate confirmation that the cancellation was covered under the Destination Policy.  Neither Specialty Underwriters nor Hyperion would acknowledge coverage at the time.  Hyperion, however, requested from Gartner, and received, detailed information with respect to vendors and attendees for the Dubai event, even though that information was unnecessary to adjust the loss.

### *Defendants' Breaches of Their Obligations Under Gartner's Event Cancellation Policies*

70.     Hyperion, in response to Gartner's request for an acknowledgment of coverage, demanded on behalf of Defendants voluminous and irrelevant documentation on the cancelled events, including lists of staff, exhibitors, contractors, and attendees, and detailed event budgets.  It also asked for the reasons why the event, cancelled at the last minute in response to the Covid-19 emergency, could not be rescheduled.  Finally, Hyperion asked Gartner to "**identify and provide written confirmation from the lists of delegates and exhibitors who had declined to attend either Event and the reason stated for their withdrawal**."  Gartner was shocked and dismayed by these voluminous, burdensome and wholly irrelevant requests.  The

volume of information sought by Hyperion and Specialty Underwriters was staggering and unnecessary, especially given the Policies' express grant of coverage for losses of whatsoever nature, directly or indirectly, caused by, resulting from, or in connection with any outbreak of a communicable disease, and the Policies' straightforward formula for calculating losses by calculating the gross revenue that would have been received if not for the covered cancellation, plus losses from commitments the insured could not avoid less recoveries and expenses not incurred.

71.     One of Gartner's brokers at Aon, George Walden, responded to Hyperion on March 11, 2020, stating that the information requested — in particular, the reasons given by individual attendees who declined to attend — was unreasonably burdensome and irrelevant to the claim, as the reason for the cancellation of the otherwise profitable event was the only relevant factor, and Covid-19 was the obvious reason for the cancellation.

72.     Specialty Underwriters, in response, affirmed that it was driving Hyperion's requests.  On March 11, 2020, as locations around the world were entering lockdown, governments were imposing travel bans and advisories, businesses were being ordered closed, and sporting and other events were being cancelled around the globe, Specialty Underwriters' Michael Thompson responded to Aon that Hyperion "is just trying to get details to support the claim and provide a detailed report to insurers.  … **The insured will need to provide the reasons/details [why] they were unable to open the show**." (Emphasis added).

73.     During March of 2020 as Covid-19 continued to spread, Gartner had to cancel two events in London, two in the United States, and three in Sweden, which had issued a ban on non-essential travel.  Each time, Aon requested that Specialty Underwriters confirm that the

cancellation was covered under the Destination Policy, given the express "Communicable Disease" coverage extension.

74.     On March 26, 2020, Specialty Underwriters finally confirmed coverage for the Tokyo and Dubai cancellations, subject to adjustment of the amounts owed.  Gillespie wrote that "[w]e don't anticipate any coverage issues on events cancelled through the end of April/beginning of May for now, however, we have to review each one individually to formally confirm coverage."  Remarkably, Specialty Underwriters did not withdraw its demand that Gartner "provide the reasons" each of the attendees were unable to attend Gartner's events.

75.     Aon responded to this communication, demanding a response regarding coverage with respect to "all events that have been cancelled and noticed to [Specialty Underwriters] to date."  Gillespie responded on March 27, 2020, only confirming coverage for seven more events in March and April that were scheduled to be held in the United Kingdom, the United States, Brazil, Japan, and Australia.

76.     On April 7, 2020, following additional requests from Aon, Specialty Underwriters confirmed coverage for all events cancelled due to Covid-19, but only through the end of May 2020, even though Gartner had notified Specialty Underwriters of cancellations beyond May.

77.     On April 14, 2020, Gartner provided detailed spreadsheets identifying the city and specific location of the events cancelled through August for the Destination Policy, and through June for the Evanta Policy, and the expected revenue associated with those events.  Included with those materials was a detailed and comprehensive spreadsheet of financial data for Event 0088 – Data and Analysis Symposium to have been held in London on March 9, 2020, showing a loss to Gartner in excess of $5,000,000 for this event alone.

78.     Hyperion ultimately notified Gartner in mid-April that it would provide a "template" for Gartner to use to provide information regarding each cancelled event.  This template, provided on April 30, 2020, required Gartner to provide disaggregated information for each cancelled/postponed event, including, but not limited to: all of the "commitments" undertaken by Gartner by vendor and date; all invoices for the event by number and date; and amounts of revenues from all customers, with invoice numbers and dates.  Because thousands of people regularly attended large Gartner events, including Gartner personnel — who each had travel and lodging expenses — the disaggregated requests were wildly burdensome, unnecessary and designed to impede the payment of valid claims.

79.     On April 15, 2020, Aon asked Specialty Underwriters to "advise next steps for a full re-instatement of limits" on both Policies.

80.     Thereafter, Aon requested that Specialty Underwriters provide written confirmation that the limits would be reinstated in accordance with the terms of the Policies.  Specialty Underwriters delayed in providing a response for weeks.  In a May 11 email, Aon's Walden called Specialty Underwriters' continued delay "frustrating and unreasonable. We must insist that [Specialty Underwriters] advise its coverage opinion as to this issue and we must demand a firm date for a response."

81.     Aon similarly demanded that Specialty Underwriters affirm coverage for events cancelled through June 2020 under the Destination and Evanta Policies "so that the insured can move forward with quantification."  Given the pandemic worldwide, "[i]t is unreasonable to not accept the obvious in light of present world events."

82. On May 12, 2020, Aon informed Specialty Underwriters that Gartner had officially cancelled events through August 2020 and some later, and was developing a plan to produce its "most profitable and strategically important conferences in Q4."

83. On May 13, 2020, Specialty Underwriters' Gillespie sent a letter to Aon in New York acknowledging the submission of claims under the Destination Policy and reiterating that Specialty Underwriters had accepted coverage of many of the individual event claims, but only subject to a reservation of rights. Gillespie's letter requested additional documentation regarding cancellations and postponements, asserting that:

> Gartner has provided USSIC no information that would permit USSIC to assess indemnity, even preliminarily. Specifically, Gartner has not provided the basis on which it determined that it was 'unable' to stage each of the events. Nor has Gartner provided even rough financial information from which USSIC might calculate loss.

That statement ignored the loss information Gartner had been providing to Hyperion.

84. Regarding reinstatement, Gillespie stated in her May 13 letter that Gartner's demand for reinstatement was "premature":

> As referenced above, the Policy provides for reinstatement of policy limits based on "potential or actual loss payment." No payment has occurred, nor has Gartner provided preliminary claim information necessary to evaluate the potential amount of each claim. In any event, whether USSIC is required to provide a reinstatement of limits that may potentially respond to a loss in progress which has already occurred or is occurring implicates complex coverage questions that implicate policy language and applicable law. **We believe that it is premature at this point to address the question, but USSIC will provide its position on this issue within fourteen (14) days of the date of this letter.**

(Emphasis added.)

85. Fourteen days later, on May 27, 2020, Gillespie provided USSIC's promised position:

> Gartner has requested that USSIC state its position in writing as to whether USSIC will reinstate limits for the Policy, pursuant to Paragraph 12 of the General Conditions and Warranties, without requiring a COVID-19 exclusion. USSIC will agree to reinstate the original limit of liability for the cancelled Shows, however, as detailed below, the reinstated liability limits for a particular Show will respond solely to costs incurred with respect to the Show or Shows for which reinstatement is requested. In no event can such reinstatement of limits be used for purposes of paying claims related to a separate and unrelated Show, nor will reinstatement of limits result in an increase in the Aggregate Limit of Indemnity.

86.     On the same day, and with no prior notice to Gartner, USSIC filed two lawsuits against Gartner in the U.S. District Court for the Southern District of Texas, where USSIC has its headquarters.  The suits sought declaratory judgments that USSIC is not obligated to reinstate the limits under the Destination Policy or the Evanta Policy, and that Gartner cannot add "new" events or claim increased projected revenues (and therefore increased coverage for individual events) beyond what Gartner expected from the 2019 iteration of these events, despite Defendants' knowledge that Gartner's event revenues increased from year to year.  None of Gartner's actions relating to the Policies or this dispute occurred in Texas, however; and USSIC should not have brought suit there.  The suits filed by USSIC were dismissed (at great expense to Gartner) for lack of personal jurisdiction.

87.     In the actions filed in Texas, USSIC alleged that Gartner's request for coverage implicates the policy exclusion for "[c]ircumstances existing prior to the inception of this insurance that could result in a loss known to the insured …."  Gartner, however, was not aware of circumstances at the inception of the policy that could result in a loss resulting from the pandemic; as a consequence, neither Gartner's cancellation of events nor layoffs of personnel (as discussed below) trigger this exclusion.  Further, on information and belief, by the time Gartner had knowledge that the pandemic could result in the cancellation of shows in 2020 and 2021, Defendants had equal or superior knowledge of the risks of losses resulting from the pandemic.

88.     Throughout 2020 and continuing into 2021, Gartner continued to provide Hyperion with volumes of information on its profit margins, commissions and other costs relating to the events canceled in 2020 as a result of the pandemic.

89.     Despite understanding that Gartner's losses under the Destination Policy substantially exceeded $150,000,000, Defendants failed and refused to make any payment at all to Gartner for any of Gartner's loss in 2020.

90.     On or about April 13, 2021, Hyperion sent Gartner a spreadsheet calculating Gartner's losses for its cancelled 2020 Destination Shows.  Hyperion calculated Gartner's insured losses for the cancelled Destination Shows at $281,919,708.  Hyperion, in that same communication, asked Gartner if it agreed with Hyperion's calculations.  Gartner promptly confirmed that it did not dispute those calculations.  On information and belief, Defendants had signed off on and agreed with Hyperion's calculations before the April 13, 2021 communication and spreadsheet were sent by Hyperion to Gartner.  Even though Defendants maintained that the most coverage available under the Destination Policy for 2020 was $150,000,000 and Hyperion had been adjusting the claims for approximately 12 months, and even though Defendants and Hyperion knew that Gartner had sustained significant losses for each cancelled show, Defendants did not then pay even $1 of loss under the Destination Policy despite their own agreement with over $280,000,000 in calculated losses.

91.     Instead, even after Hyperion's calculation of Gartner's losses of $281,919,708 communicated to Gartner on April 13, 2021, Defendants continued delaying payment of any of Gartner's losses.  In a subsequent email to Aon, Specialty Underwriters stated that part of its delay was because it needed to communicate with USSIC's reinsurers, even though nothing in

the Policies permitted Defendants to delay payment of claims until the payment was approved or funded by the reinsurers.

92.     Despite Gartner's timely communication that it did not dispute Hyperion's calculations of the losses of revenues from the Destination Shows, no payment was made by Defendants until May 27, 2021 when $150,000,000 was finally wired to Gartner.  That payment did not include any interest on monies that should have been paid long before May 27, 2021.  Further, despite Gartner documenting over $50,000,000 in loss due to the cancellation of Evanta Shows, Defendants have not paid even $1 of loss under the Evanta Policy.

### *Defendants Disclaim All Coverage for 2021 Losses Due to Covid-19*

93.     Pursuant to the Destination Policy, Gartner provided the 2021 Schedule of events to be covered under the policy by February 1, 2021.

94.     Also pursuant to the Destination Policy, Gartner was required to pay a deposit premium of $1,130,936 by March 1, 2021.  Gartner paid the premium on or before March 1.

95.     The events on the 2021 Schedule submitted to Defendants were events that Gartner had held in 2019 and, as of the Destination Policy's inception on December 30, 2019, Gartner had planned to hold again in 2020 and 2021.  Accordingly, those events were included on the interim Schedule that Specialty Underwriters included in the two-year Destination Policy when it was issued.  The events on the 2021 Schedule submitted to Defendants were also included on the 2020 Schedule given to Defendants in February of 2020, which had been accepted by Defendants and had also been insured by USSIC under its prior two-year policy.

96.     By emails from Specialty Underwriters to Gartner in March of 2021, Defendants took the position that USSIC would insure only those events:

> that Gartner actually intends to hold as of 2/1/21 at the per event limit of insurance (revenue) provided under the 2020 Schedule.  Based on our review of Gartner's 2021 Schedule of Shows, attached, we have identified

15 such Actual Shows that Gartner declared as going forward or rescheduled. Because Covid-19 was a known loss on the Effective Date of coverage for the 2021 Shows (on January 1, 2021), a Covid exclusion will apply to these 15 Shows.

97.     Because the events on the 2021 Schedule were annual events held by Gartner in years past, were previously insured by Defendants, were included on the interim Schedule attached to the two-year Destination Policy and had been planned prior to the Covid-19 pandemic, the cancellation of Gartner events in 2021 was not a "known loss" as of the time the terms of the Destination Policy were agreed to between Gartner and Defendants, which took place in 2019. Those events therefore were insured by Defendants and Gartner's losses from the cancellation of those events are covered because the events were cancelled by Gartner because of an insured "outbreak of a communicable disease."

98.     By asserting that USSIC could refuse to cover Gartner's recurring shows that had been planned for 2021 as of the policy's inception, Defendants effectively eviscerated coverage for the second year of the two-year policy that Gartner purchased, and have attempted an improper mid-policy cancellation of coverage for those shows contrary to the Destination Policy terms prohibiting cancellation except for non-payment of premium.

## COUNT I
### DECLARATORY JUDGMENT –
### REINSTATEMENT OF LIMITS – USSIC

99.     Gartner realleges the allegations of the foregoing paragraphs.

100.    The Destination Policy provides Gartner with the right, at its sole option, to reinstate the portion of the initial annual aggregate limits of liability that has been used for any actual or potential loss, up to an additional $150,000,000 per year.

101.    The Evanta Policy provides Gartner with the right, at its sole option, to reinstate the portion of the initial aggregate limits of liability that has been used for any actual or potential loss, up to an additional $20,000,000.

102.    Gartner's right to reinstate the aggregate limit for each year of the Destination Policy and thereby obtain $300,000,000 in coverage per year if needed to cover Gartner's losses was a key feature and contractual obligation of the coverage Gartner paid for.

103.    Gartner's right to reinstate the aggregate limit of the Evanta Policy to obtain $40,000,000 in coverage if needed to cover Gartner's losses was a key feature and contractual obligation of the coverage Gartner paid for.

104.    Because Gartner purchased the Destination Policy effective December 30, 2019, and the Evanta Policy effective July 1, 2019, the subsequent cancellations of Gartner's events in 2020 and 2021 are not "known losses," and the exclusion for circumstances known to Gartner at the "inception" of the Policies does not apply.  There is an actual controversy between the parties regarding Gartner's right to reinstate the aggregate annual limits of the Destination Policy and the aggregate limits of the Evanta Policy.

105.     Gartner is entitled to a declaration that it is entitled to reinstate the initial aggregate limits of the Destination Policy for each policy year, and the aggregate limits of the Evanta Policy, in part or in full, at its option, and that those reinstated limits are available to cover losses for any of Gartner's scheduled shows, and that Defendants are estopped from refusing to reinstate the limits of liability to provide coverage for any show after the initial limits are exhausted.

**COUNT II**
**DECLARATORY JUDGMENT – COVERAGE FOR 2020 EVANTA SHOWS – USSIC**

106.    Gartner realleges the allegations of the foregoing paragraphs.

107.    Months after receiving the Evanta 2020 schedule, Specialty Underwriters refused, on behalf of USSIC, to insure what it considered to be new shows as well as the "recurring" events at 2020 budgeted revenue levels, asserting that coverage for those shows did not "incept" until after Gartner became aware of the risks of the Covid-19 pandemic, and thus any increase in expected revenues reflected in the Evanta 2020 schedule over 2019 levels would be subject to a Covid-19 exclusion.

108.    Specialty Underwriters unilaterally imposed these new mid-policy restrictions notwithstanding the Evanta Policy's June 15, 2019 inception date as well as the parties' prior course of dealing and understandings with Gartner on which Gartner had relied for years.

109.    There is an actual controversy among the parties with respect to coverage for the individual shows on the schedule provided by Gartner as well as the per show limits under the Evanta Policy for the shows that Gartner had scheduled and planned to hold during 2020.

110.    Gartner is entitled to a declaration that USSIC is obligated to provide coverage under the Evanta Policy for the shows on the schedule provided by Gartner as well as at the levels stated in the 2020 schedule and to do so without an exclusion for losses related to Covid-19; or, in the alternative, that USSIC is estopped from refusing to accept and cover the events on the Evanta 2020 schedule submitted by Gartner (Exhibit F) at the levels stated therein by the parties' prior course of dealing and Gartner's reasonable reliance on Specialty Underwriters' prior conduct on behalf of USSIC.

## COUNT III
### DECLARATORY JUDGMENT – DESTINATION POLICY 2021 SHOWS – USSIC

111.    Gartner realleges the allegations of the foregoing paragraphs.

112.    Defendants sold Gartner a two-year policy covering Destination Shows that Gartner planned to stage during 2020 and 2021.

113.    The Destination Policy, consistent with the parties' course of dealing since 2007, was initially issued using Gartner's 2019 events schedule as the interim Schedule for 2020 and 2021.  The final 2020 Schedule, which Aon provided to Specialty Underwriters on or about February 11, 2020, included recurring Destination Shows from the 2019 schedule, with updated revenue estimates.  Specialty Underwriters accordingly increased the premium based on the actual 2020 Schedule, and Gartner paid the increased premiums.

114.    The parties intended and the Destination Policy provided that there would be coverage for shows Gartner had planned to put on in 2021 but had to cancel because of an outbreak of a "communicable disease," and that Gartner would submit the 2021 Schedule by February 1, 2021, which Gartner did.

115.    USSIC has disclaimed coverage for all shows that Gartner had planned to hold during 2021 that were cancelled because of Covid-19, and for any losses that Gartner may incur due to Covid-19 with respect to those shows.

116.    There is an actual controversy between the parties as to whether or not the two-year Destination Policy obligates USSIC to provide coverage for Gartner's losses due to the cancellation of shows that Gartner had intended to hold during 2021, and for any losses that Gartner may incur due to the impact of Covid-19 on shows that are scheduled on the Destination Policy for future dates in 2021.

117.    Gartner is entitled to a declaration that:  (i) USSIC must indemnify Gartner for loss due to the "Cancellation" of Destination Shows that Gartner had intended, as of the policy inception in December 2019 (prior to the Covid-19 pandemic), to hold during 2021 including both those shows that Gartner had been forced to cancel by the time stated in the policy for delivery of the 2021 Schedule and for the subsequent cancellation of those shows  that it still

intended to hold during the latter part of 2021 at the time it delivered the 2021 Schedule to USSIC, and (ii) the endorsements to the Destination Policy purporting to add Covid exclusions for 2020 and 2021 after the Destination Policy incepted in December 2019 are not valid or enforceable.  Gartner is also entitled to a declaration that USSIC is estopped from denying coverage for the shows listed by Gartner on the 2021 Schedule provided to Defendants on or about February 1, 2021, even though some shows had been cancelled by that date.

**COUNT IV**
**BREACH OF CONTRACT – DESTINATION POLICY -- USSIC**

118.    Gartner realleges the allegations of the foregoing paragraphs.

119.    The Destination Policy gives Gartner the option to reinstate the aggregate annual limits of liability for any reason, up to an additional $150,000,000 for 2020 and an additional $150,000,000 for 2021 in the event that Gartner's losses exhaust the original limits for that year.

120.    Gartner's right to reinstate the aggregate limits of the Destination Policy for 2020 and 2021 to access a full $300,000,000 in coverage for 2020 and again for 2021 if required to cover Gartner's losses was a key feature and contractual obligation of the coverage Gartner paid for.

121.    Defendants have acknowledged that Gartner's losses due to cancellation of its Destination Shows during 2020 exceed $280,000,000.  USSIC has paid only $150,000,000 in covered losses and has refused to reinstate the aggregate annual limits of liability.  USSIC's breach of the Destination Policy by refusing to reinstate its limits has deprived Gartner of as much as $150,000,000 in coverage for 2020.

122.    USSIC further breached the Policy by imposing a new, mid-policy "Coronavirus Exclusion" for two of Gartner's Destination Shows scheduled for 2020 and by disclaiming

coverage for Gartner's losses due to the cancellation of those shows, while charging premium for those shows.

123.    Gartner has also suffered losses during 2020 beyond the losses of revenue from cancelled shows, including losses incurred for the reductions in force in its conference business; such losses are covered by the Destination Policy's Extension of Coverage for "loss, damage, cost or expense of whatsoever nature directly or indirectly cause by resulting from or in connection with any outbreak of communicable disease" covered by the Destination Policy's "Communicable Disease" Extension of Coverage.

124.    Gartner provided Defendants with the 2021 Schedule of events by February 1, 2021, as required by the Destination Policy, and paid the required premium.  USSIC breached the Destination Policy by refusing to cover Gartner's events that it had intended to hold during 2021 but was forced to cancel.

125.    In further breach of the Destination Policy, USSIC unilaterally imposed a new, mid-policy Covid exclusion for those shows that Gartner still intended to hold during 2021.  By refusing to cover any of the events that Gartner had intended to hold during 2021 but cancelled due to the pandemic, USSIC has also deprived Gartner of the reinstatement coverage for 2021 that it purchased, in breach of the Destination Policy.

126.    Gartner has been damaged by each of USSIC's breaches in an amount to be determined at trial.

## COUNT V
### BREACH OF CONTRACT – EVANTA POLICY – USSIC

127.    Gartner realleges the allegations of the foregoing paragraphs.

128.    Defendants were obligated to insure the Evanta Shows listed on the schedule provided by Gartner to Defendants in March of 2020, and at the level of revenues reflected on the Schedule.

129.    The Evanta Policy provides Gartner with the option to reinstate the aggregate limits of liability for any reason up to an additional $20,000,000 in the event that Gartner's losses exhaust the original limits.

130.    Gartner's right to reinstate the limits of the Evanta Policy to access a full $40,000,000 in coverage if required to cover Gartner's Evanta losses was a key feature and contractual obligation of the coverage Gartner paid for.

131.    USSIC breached the Evanta Policy by refusing to reinstate the Policy's aggregate limits, thereby depriving Gartner of as much as $20,000,000 in coverage.

132.    USSIC further breached the Evanta Policy by refusing to accept the schedule of events and revenues that Gartner planned long before the Covid-19 pandemic.

133.    USSIC further breached the Evanta Policy by failing to pay for any of Gartner's losses for cancellations of the Evanta shows.

134.    Gartner has been damaged by USSIC's breach in an amount to be determined at trial.

## COUNT VI
### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING - USSIC

135.    Gartner realleges the allegations of the foregoing paragraphs.

136.    Since learning that Gartner would be required to cancel its insured shows due to Covid-19, USSIC, directly and through its agent, Specialty Underwriters, engaged in a series of acts to frustrate, impair or destroy Gartner's rights to receive the fruits of the Policies.

137.    Specialty Underwriters, on behalf of USSIC, delayed responding to Gartner's request for reinstatement of the limits of the Destination Policy.  When Specialty Underwriters finally responded on May 13, 2020, it represented to Gartner that its requests for reinstatement of the limits were premature, but that it would respond within two weeks to Gartner's prior requests for a coverage position.  On information and belief, Specialty Underwriters' delays and May 13, 2020 representations were intended to give USSIC sufficient time to prepare and file declaratory judgment actions in Texas, while lulling Gartner to take no action by telling Gartner its reinstatement request was "premature," therefore ensuring that USSIC was able to choose a forum inconvenient to Gartner, where none of the witnesses or evidence is located, and which lacked personal jurisdiction over Gartner.

138.    Gartner reasonably relied on Specialty Underwriters' representations on behalf of USSIC that Gartner's request for reinstatement was "premature," but that Specialty Underwriters was working in good faith to determine its coverage position.  As a result of its reasonable reliance, Gartner was forced to respond to two separate lawsuits filed by USSIC in Houston, Texas.  USSIC lacked a good faith basis to file its lawsuits in Texas and each lawsuit has since been dismissed.

139.    USSIC also breached the implied covenant of good faith and fair dealing by delaying payments of losses that it knew or should have known were owed and should have been timely paid, by demanding (through Hyperion) burdensome and unnecessary information about the amount of loss for each of Gartner's cancelled 2020 shows although Defendants knew that Gartner's 2020 losses exceeded the initial aggregate limits and nevertheless refused to permit Gartner to reinstate those limits; by demanding burdensome and irrelevant information about the reason for the cancellation of Gartner's shows, which reason was obvious; by purporting to add

new exclusions and limitations on coverage to the Policies; by unilaterally altering Gartner's

Schedule of Evanta Shows for 2020; and by refusing to accept Gartner's Schedules even for the

recurring Destination Shows that it had planned to hold and would have held in 2021 but for the

pandemic.

140.    USSIC's actions, through its agent, Specialty Underwriters, were intended to

deprive Gartner of its rights to receive the benefits of the Destination and Evanta Policies.

141.    USSIC's breaches of the implied covenant of good faith and fair dealing,

including through its agent, Specialty Underwriters, have caused Gartner losses of money,

attorneys' fees and expenses for which USSIC is liable, in an amount to be determined at trial.

**COUNT VII**
**UNFAIR AND DECEPTIVE ACTS (MASS. G.L. C. 93A) –**
**BOTH DEFENDANTS**

142.    Gartner realleges the allegations of the foregoing paragraphs.

143.    Gartner is engaged in trade or commerce.  Defendants are engaged in the business

of insurance and in trade or commerce.

144.    Specialty Underwriters, on behalf of itself and as agent for USSIC, committed

unfair and deceptive acts and practices in violation of Massachusetts General Laws

chapters 93A, §§ 2 and 11, and chapter 176D, §3(9), by misrepresenting the coverage available

under the Policies in communications from Specialty Underwriters' personnel located in

Massachusetts and in the handling of Gartner's Covid-19 cancellation claims in Massachusetts,

including but not limited to Defendants' refusal to permit Gartner to exercise its contractual

rights to reinstate the Policies' limits, Defendants' denial of coverage for Gartner's Destination

Shows that it planned to hold in 2021 that were cancelled because of Covid-19, Defendants'

purported addition of mid-policy exclusions to the Destination Policy and to the Evanta Policy,

thereby substantially reducing  the value of the Policies and charging premiums for illusory

coverage, and by Defendants' substantial delays in payment of covered losses.  These acts and decisions (as well as all of Specialty Underwriters' conduct relating to Gartner's event cancellation policies and the handling of Gartner's claims under those policies), including the decisions to deny coverage to Gartner and to add mid-policy exclusions to the Policies, were made and communicated to Gartner and Aon primarily and substantially in and from Massachusetts.

145.    Among the unfair and deceptive acts and practices Specialty Underwriters committed in Massachusetts on behalf of itself and USSIC with regard to the Destination and Evanta Policies are the following:

      i.     Failing to provide prompt confirmations of coverage for the clearly necessary cancellation of events through August 2020, and instead demanding irrelevant and burdensome documentation and failing to provide prompt and clear coverage positions;

      ii.    Advising Gartner that its request that Defendants acknowledge Gartner's right to reinstate coverage was "premature" and that it would provide its decision on reinstatement in fourteen days, when on information and belief, such decision had already been made.  Defendants did so in order to lull Gartner into awaiting Specialty Underwriters' coverage position while, undisclosed to Gartner, USSIC was using that time to prepare and file declaratory judgment actions in Texas, therefore ensuring that Gartner did not file an action first, and subjecting Gartner to additional delay and expense in moving to dismiss (successfully) Defendant USSIC's meritless lawsuits in Texas;

      iii.   Refusing to cover new events and the increased revenue expectations from recurring events reflected in the 2020 and 2021 schedules provided by Gartner, notwithstanding the parties' prior course of dealing on which Gartner reasonably relied to determine the timing of its submission of the Policy schedules;

      iv.   Delaying payment of claims of undisputed amounts, including on the basis that Defendants needed to get their reinsurers "on board" regarding coverage even though the policies do not permit a delay in payment on that basis**;**

      v.    Unilaterally adding a mid-policy exclusion for Covid-related losses to the Destination Policy and the Evanta Policy that substantially reduced the

value of the Policies, after the policy terms and pricing had been agreed to and the Policies had been purchased;

vi.     Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue by representing that widespread fear of flying and travel by attendees in the face of a global pandemic and widespread travel advisories was an inadequate reason for cancellation of an event under the Policies, and therefore there would not be coverage for such cancellations;

vii.    Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under the Policies, by failing to provide prompt confirmations of coverage for the clearly necessary cancellation and postponements of events, and demanding irrelevant documentation and otherwise neglecting to provide prompt and clear coverage positions;

viii.   Failing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear;

ix.     Failing to provide promptly a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim; and

x.      Charging premium for coverage of events Defendants knew or should have known would not take place because of Covid-19, while at the same time applying a Covid-19 exclusion to those events.

146.    Gartner has suffered a loss of money and the value of the policies it purchased, and incurred attorneys' fees and expenses, as a result of the above violations of Massachusetts G. L. c. 93A.  Defendants' violations of Massachusetts G. L. c. 93A were willful or knowing.

## COUNT VIII
### UNFAIR AND DECEPTIVE ACTS
### (CONN. GEN. STAT. § 38A-815, *ET SEQ.*/CONN. GEN. STAT. § 42-110B, *ET SEQ.*) –
### BOTH DEFENDANTS (PLED IN THE ALTERNATIVE TO COUNT VII)

147.    Gartner realleges the allegations of the foregoing paragraphs.

148.    At all relevant times, Specialty Underwriters on behalf of itself and USSIC was a "person" within the meaning of the Connecticut Unfair Insurance Practices Act, Conn. Gen. Stat. § 38a-815 *et seq.* ("CUIPA"), and the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat.

§ 42-110b, *et seq.* ("CUTPA"), and was acting in the conduct of its trade or business within the meaning of CUIPA and CUTPA.

149.    At all relevant times, Gartner's headquarters and principal place of business were situated in Stamford, Connecticut.

150.     The Policies required that all notices to Gartner be sent to Gartner's Connecticut headquarters.

151.    Specialty Underwriters, on behalf of itself and as agent for USSIC, committed unfair and deceptive acts and practices in violation of CUIPA and CUTPA, by misrepresenting to Gartner in Connecticut the coverage available under the Policies; by telling Gartner its request for reinstatement was "premature" and that Defendants would advise Gartner of its position on reinstatement in 14 days; and, instead of advising Gartner of its position on reinstatement, by filing two lawsuits in Texas and, when Gartner filed this lawsuit, arguing that the Texas cases should go forward since they were filed before this lawsuit.  Defendants also violated CUIPA and CUTPA in the handling of Gartner's Covid-19 cancellation claims, including but not limited to Defendants' refusal to permit Gartner to exercise its contractual rights to reinstate the Policies' limits; Defendants' denial of coverage for Gartner's Destination Shows that it planned to hold in 2021 that were cancelled because of Covid-19; Defendants' purported addition of mid-policy Covid-19 exclusions to the Destination Policy and to the Evanta Policy, thereby substantially reducing or completely eliminating  the value of the Policies and charging premiums for illusory coverage; and by Defendants' substantial delays in payment of millions of dollars in  covered losses.  These acts and decisions (as well as all of Specialty Underwriters' conduct relating to Gartner's event cancellation policies and the handling of Gartner's claims under those policies), including the decisions to deny coverage to Gartner and addition of mid-policy exclusions to the

Policies, were made and communicated to Gartner, through Aon, and directly by Defendants to

Gartner in Connecticut, including by communicating directly to Gartner in Connecticut

Defendants' rejection of Gartner's schedule of events for 2021 and advising Gartner directly in

Connecticut that Defendants were adding a Covid-19 exclusion to the Destination Policy.

152.    Specialty Underwriters, on behalf of itself and USSIC, acted in bad faith and with

willful and malicious intent by engaging in the following conduct with respect to the Policies:

     i.    Failing to provide prompt confirmations of coverage at the request of Gartner's senior management for the clearly necessary cancellation of events through August 2020, and instead demanding from Gartner irrelevant and burdensome documentation and failing to provide prompt and clear coverage positions;

    ii.    Advising Gartner that its request that Defendants acknowledge Gartner's right to reinstate coverage was "premature" and that it would provide its decision on reinstatement in fourteen days, when on information and belief, such decision had already been made.  Defendants did so in order to lull Gartner into awaiting Specialty Underwriters' coverage position while, undisclosed to Gartner, USSIC was using that time to prepare and file two declaratory judgment actions in Texas, therefore ensuring that Gartner did not file an action first, and subjecting Gartner to additional delay and expense in moving to dismiss (successfully) Defendant USSIC's meritless lawsuits in Texas;

    iii.    Refusing to cover new events and the increased revenue expectations from recurring events reflected in the 2020 and 2021 schedules provided by Gartner, notwithstanding the parties' prior course of dealing on which Gartner reasonably relied to determine the timing of its submission of the Policy schedules;

    iv.    Delaying payment of claims of undisputed amounts submitted by Gartner, including on the basis that Defendants needed to get their reinsurers "on board" regarding coverage even though the policies do not permit a delay in payment on that basis;

    v.    Unilaterally adding a mid-policy exclusion for Covid-related losses to the Destination Policy and the Evanta Policy that substantially reduced the value of the Policies, after the policy terms and pricing had been agreed to and the Policies had been purchased;

    vi.    Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue by representing that widespread fear of flying and travel

by attendees in the face of a global pandemic and widespread travel advisories was an inadequate reason for cancellation of an event under the Policies, and therefore there would not be coverage for such cancellations;

vii.    Failing to acknowledge and act reasonably promptly upon communications from Gartner with respect to claims arising under the Policies, by failing to provide prompt confirmations of coverage for the clearly necessary cancellation and postponements of events, and demanding irrelevant documentation and otherwise neglecting to provide prompt and clear coverage positions;

viii.   Failing to effectuate prompt, fair and equitable settlements of claims submitted by Gartner in which liability has become reasonably clear;

ix.     Failing to provide promptly a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim; and

x.      Charging premium for coverage of events Defendants knew or should have known would not take place because of Covid-19, while at the same time applying a Covid-19 exclusion to those events.

153.    Upon information and belief, Specialty Underwriters on behalf of itself and USSIC engaged in the aforementioned acts and practices as part of its general business practice.

154.    Specialty Underwriters, on behalf of itself and USSIC, willfully and knowingly engaged in the foregoing acts and practices, evidencing a pattern of behavior that is unethical, oppressive, unscrupulous, and offensive to public policy, and constituting unfair and deceptive acts and practices in the conduct of trade or commerce in violation of CUIPA and CUTPA.

155.    As a result of the foregoing unfair and deceptive acts and practices, Gartner has suffered a substantial and ascertainable loss in Connecticut, including the loss of money and the value of the Policies it purchased, and incurred attorneys' fees and expenses, within the meaning of CUTPA.

156.    Defendants' unfair and deceptive conduct is intimately associated with trade and commerce in Connecticut, and/or choice of law principles dictate the application of CUIPA and CUPTA to the allegations set forth in this Count.

157.    The foregoing acts and practices of Specialty Underwriters on behalf of itself and USSIC were willful and demonstrate calculated, deceitful and unfair conduct and reckless indifference to Gartner's rights.  Accordingly, Gartner is entitled to punitive damages pursuant to Conn. Gen. Stat. § 42-110g(a).

158.    Pursuant to Conn. Gen. Stat. § 42-110g(c), Gartner has given or will give notice of its claims to the Attorney General of the State of Connecticut and to the Commissioner of Consumer Protection for the State of Connecticut.

### COUNT IX
### DECLARATORY JUDGMENT - Estoppel – Both Defendants

159.    Gartner realleges the allegations of the foregoing paragraphs.

160.    Until 2021, for each of Gartner's consecutive two-year event cancellation policies since the parties' relationship began, Defendants have never refused to insure the events that Gartner included on its schedule for the policy's second year of coverage.  Instead, Defendants, by their conduct and course of dealings, led Gartner to believe that by purchasing a two-year policy, Gartner had secured two years of insurance for all events listed on the initial policy schedule with limits at least as great as the limits listed on the initial policy schedule, subject only to payment of the premium for the second year calculated at the rate set in the policy.

161.    Before 2021, Defendants intentionally concealed from Gartner that they did not believe that the policy did in fact cover two years of recurring shows, that they could reject the second year of coverage for a recurring event that was included on a policy's initial schedule of insured events, and that they believed that after the policy was issued, they could unilaterally add a new exclusion to the policy reducing coverage.

162.    Defendants' intentional failure to disclose their position with respect to coverage available to Gartner under the Destination Policy for two years of recurring shows was a tactical

decision made by Defendants, who were armed with knowledge of their true positions concerning coverage under the Destination Policy; who knew that Gartner reasonably relied on Defendants' representations during the parties' course of conduct; and who knew that Gartner would suffer resulting harm based on its reliance on Defendants' false representations.

163.    If Defendants had timely disclosed their newly-revealed position that they could change course mid-policy, and for the second year of a two-year policy could reject coverage for events insured for the first of the two policy years, Gartner would have taken alternative steps to obtain coverage for the events it planned to hold during the second policy year, as it believed it had done by purchasing a two-year policy and submitting the schedules within the time periods set forth in the policies.

164.    Defendants knew that Gartner had negotiated for event cancellation coverage with a lower initial limit plus the right to reinstate that initial limit for an additional premium, and renewed that coverage for several years without interruption.  Defendants also knew or should have known that due to the size, nature and necessary planning for Gartner's shows, a cancelled show would not be held during the year in which it was cancelled and therefore, reinstated limits for loss due to a cancelled show would be useless if those limits could not be applied to another show.

165.    Defendants nonetheless intentionally failed to disclose to Gartner when it purchased the Policies with a reinstatement provision that provided coverage for reinstatement for cancelled shows, or at any time before Gartner sought to exercise its right to reinstate the policy limits at its "sole option," that Defendants would not permit Gartner to use reinstated policy limits for a cancelled show in order to provide coverage for any other show on its

schedule that had to be cancelled, and that Defendants would cap the total of the initial limit plus the reinstated limit at the amount of the initial annual aggregate limit.

166.   Defendants' intentional failure to disclose their position with respect to reinstatement of limits under the Destination Policy and Evanta Policy was a tactical decision made by Defendants, who were armed with knowledge of their true positions concerning reinstatement of limits; who knew that Gartner reasonably relied on Defendants' representations during the parties' course of conduct; and who knew that Gartner would suffer resulting harm based on its reliance on Defendants' false representations.

167.   If Defendants had timely disclosed their newly-revealed positions that reinstated limits due to loss for a cancelled show could not be applied to replenish the aggregate limit available for any other show and that even if Gartner exercised its right to purchase reinstated limits, the initial aggregate limit could never be increased, Gartner would have elected to purchase greater annual limits for its Destination Shows and for the Evanta Shows, as it believed it had done.

168.   Defendants have also taken the position that there is no coverage for the events and shows Gartner intended to stage in 2021 but had to cancel  because of Covid-19 because by January 1, 2021, Covid-19 was known to cause losses, and therefore coverage is barred; however, Gartner had planned the events that were to take place in 2021 well before January 2021 and could have delivered a schedule of 2021 events prior to January 2021 had Defendants requested it or the Destination Policy called for it.

169.   Gartner relied significantly and justifiably to its detriment on Defendants' conduct, course of action and concealment, and as a result has been prejudiced and suffered a loss of money for which Defendants are liable, in an amount to be determined at trial.

170.     There is an actual controversy among the parties with respect to coverage for the cancelled Destination Shows and Evanta Shows and the reinstatement of limits under the Destination Policy and Evanta Policy, respectively.

171.     Gartner is entitled to a declaration that the Defendants are equitably estopped from:  1) refusing to insure and denying coverage for Gartner's losses in 2021 for the cancellation of the annual events that USSIC insured during 2020 that Gartner had intended to again hold during 2021 until precluded from doing so by the Covid-19 pandemic; 2) unilaterally adding to the Destination Policy a new, mid-policy exclusion for Covid-related losses applicable to 2021; 3) refusing to permit Gartner to reinstate the full initial $150,000,000 annual aggregate limit of the Destination Policy for 2020, the full initial $150,000,000 annual aggregate limit of the Destination Policy for 2021, and the full initial $20,000,000 aggregate limit of the Evanta Policy (or such smaller portion of the limits as Gartner may elect); 4) refusing to apply the reinstated limits to cover Gartner's loss due to the cancellation of any scheduled show and 5) denying coverage for 2021 losses on the basis that Covid-19 was a known loss when Gartner planned and could have provided a schedule of 2021 events before Covid-19 was a known loss.

## PRAYER FOR RELIEF

WHEREFORE, Gartner respectfully requests that the Court:

a.      Enter judgment declaring that Gartner is entitled to reinstate the $150,000,000 initial annual aggregate limit of the Destination Policy for 2020; the $150,000,000 initial annual aggregate limit of the Destination Policy for 2021; and the $20,000,000 initial aggregate  limit of the Evanta Policy, in part or in full, at its option;

b.      Enter judgment declaring that USSIC is obligated to provide coverage under the Evanta Policy at the levels stated in the Schedule of Evanta 2020 shows  provided to Specialty Underwriters, without an exclusion for losses related to Covid-19; or, in the alternative, that Defendants are equitably estopped from refusing to accept and cover the Evanta events that Gartner intended to hold during 2020 that were included on Gartner's 2020 schedule of Evanta shows provided to Specialty

Underwriters at the amounts stated in that schedule and without an exclusion for losses related to Covid-19;

c.      Enter judgment declaring that USSIC must indemnify Gartner for loss due to the "Cancellation, Curtailment, Postponement, Interruption, Relocation/Removal to Alternative Premises, or Abandonment" of the Destination Shows that Gartner had intended to hold during 2021 prior to the Covid-19 pandemic and for those losses that Gartner incurred or may incur due to the impact of Covid-19 on the scheduled shows that it intended to hold during 2021 as of the time it delivered the schedule for 2021 to USSIC, including a declaration that USSIC may not add a Covid exclusion to the Destination Policy for Gartner's 2021 shows;

d.      Enter judgment declaring that the losses suffered by Gartner's cancellations in 2020 and 2021 are not barred by the common law doctrines of "known loss" or "fortuity" or the exclusion for circumstances "existing prior to the inception of this insurance" known to certain Gartner officers that could result in a loss;

e.      Award damages for USSIC's breach of contract;

f.      Enter judgment declaring that Defendants are equitably estopped from:  1) refusing to insure and denying coverage for Gartner's losses in 2021 for the cancellation of the annual events that USSIC insured during 2020 that Gartner had intended to again hold during 2021 until precluded from doing so by the Covid-19 pandemic; 2) unilaterally adding to the Destination Policy a new, mid-policy exclusion for Covid-related losses applicable to 2021; 3) refusing to permit Gartner to reinstate the full initial $150,000,000 annual aggregate limit of the Destination Policy for 2020, the full initial $150,000,000 annual aggregate limit of the Destination Policy for 2021, and the full initial $20,000,000 aggregate limit of the Evanta Policy (or such smaller portion of the limits as Gartner may elect); 4) refusing to apply the reinstated limits to cover Gartner's loss due to the cancellation of any scheduled show; and 5) relying upon "known loss" as a basis to deny coverage for 2021 events;

g.      Award damages for USSIC's breach of the implied covenant of good faith and fair dealing;

h.      Award damages for Defendants' violations of Mass. G.L. c. 93A, including double or treble damages for each of Defendants' willful and knowing violations;

i.      Award damages for Defendants' violations of Conn. Gen. Stat. § 42-110b *et seq.* and § 38a-815 *et seq.*, including punitive damages for each of Defendants' willful and knowing violations pursuant to common law and/or Conn. Gen. Stat. § 42-110g(a);

j.      Award interest, as well as Gartner's reasonable attorneys' fees and costs, including pursuant to Conn. Gen. Stat. § 42-110g(a); and

k.      Award all other relief that the Court deems just and proper.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff Gartner, Inc. hereby demands

a trial by jury as to all claims and all issues so triable.

Dated: February 24, 2022
New York, New York

SHIPMAN & GOODWIN LLP


By: /s/ Andrew M. Zeitlin
Andrew M. Zeitlin (AZ 0026)
Tracy E. Williams (TW 5813)
300 Atlantic Street, 3rd Floor
Stamford, CT 06901
azeitlin@goodwin.com
203.324.8100

Steven L. Schreckinger (MA BBO #447100)
(*pro hac vice* admitted)
Tamara S. Wolfson (MA BBO #554347)
(*pro hac vice* admitted)
David S. Mackey (MA BBO #542277)
(*pro hac vice* admitted)
ANDERSON & KREIGER LLP
50 Milk Street, 21st Floor
Boston, MA 02109
617.621.6580

CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of February, 2022, the foregoing Second Amended Complaint and Jury Demand was filed electronically via operation of the Court's CM/ECF Electronic Filing System.  A Notice of Electronic Filing will be sent by e-mail to all parties appearing in this matter via operation of the Court's CM/ECF Electronic Filing System or by mail to anyone unable to accept electronic filing as indicated on the Notice.  Parties may access this filing through the Court's CM/ECF System.

/s/ Andrew M. Zeitlin

10867126